## LEVANT v. KOWAL.

1. CORPORATIONS—DIRECTORS—TRUSTS—EQUITY.

Equity may properly exercise authority over the affairs of a corporation to preserve and administer the estate when the board of directors, as trustee of the estate, fails to function either by fraud, conspiracy, or extreme mismanagement in such a way that rights of stockholders are put in imminent peril and the underlying, original, corporate *entente cordiale* is unfairly destroyed (CL 1948, § 450.13).

2. SAME—STATES.

The State has and retains an interest in the proper functioning of a corporation.

3. SAME—CHARTERS—CONTRACTS—STATE—STOCKHOLDERS.

The charter of a corporation is a contract between the State and the corporation, between the corporation and the stockholders, and between the stockholders and the State.

4. SAME—BREACH OF TRUST.

A corporation must come up to all the substantial objects for which it was instituted, for if it depart from any of these it is guilty of a breach of trust.

5. SAME—FRANCHISE.

A corporation is made a political body on the implied condition that it should demean itself faithfully and honestly in the use of its franchise.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 13 Am Jur, Corporations §§ 1014, 1046.
[2, 4] 13 Am Jur, Corporations § 1317.
[3] 13 Am Jur, Corporations § 77 *et seq.*
[4] 13 Am Jur, Corporations § 1314.
[6] 13 Am Jur, Corporations § 1322.
[8] 13 Am Jur, Corporations § 1324.
[9] 13 Am Jur, Corporations § 173.
[11] 13 Am Jur, Corporations § 1323.

6. SAME—DISSOLUTION—EQUITY.

A court of equity has inherent power to decree the dissolution of a corporation when a case for equitable relief is made out upon traditional equitable principles.

7. EQUITY—CORPORATIONS.

The function of a court of equity to give such relief as justice and good conscience require is not diminished by reason of the fact that a corporation is involved.

8. CORPORATIONS—EQUITY—WINDING UP AFFAIRS.

The general rule that equity has no power to wind up a corporation in the absence of statutory authority is subject to the qualification that when because of a deadlock in the board of directors or stockholders, the corporate purposes cannot be attained, the affairs of the corporation should be wound up, since to continue the business under such circumstances would involve an unauthorized exercise of the corporate franchise where the circumstances disclose financial loss, corporate paralysis, mismanagement and deterioration of property, although insolvency is not yet present.

9. SAME—STOCKHOLDERS—OWNERSHIP.

Stockholders are the equitable owners of a corporate enterprise and not the legal owners of the assets as such.

10. SAME—SHARES OF STOCK—OWNERSHIP.

A share of stock in a corporation is one of the proportionate integers or units of the capital stock and is the interest or right which the owner or holder thereof has in the management of the corporation and to share in the profits thereof and in the property and assets thereof on dissolution, after payment of corporate debts and obligations.

11. SAME—DISSOLUTION—CONSTRUCTION OF PRAYER—OPTION AS TO SALE OF CAPITAL STOCK.

Prayer for dissolution of corporation and distribution of the cash avails of its assets, contained in bill filed by owners of 50% of the capital stock, is not construed as an offer or desire to transfer the capital stock of the corporation within meaning of written option as to capital stock, entered into between the 2 ownership factions of close corporation before serious differences occurred which resulted in deadlocked management and plaintiffs' petition for dissolution.

Appeal from Wayne; O'Hara (Chester, P.), J. Submitted June 5, 1957. (Docket No. 15, Calendar No. 47,233.) Decided November 26, 1957. Rehearing dismissed on stipulation March 4, 1958.

Bill by J. Phillip Levant, Henry C. Keywell and others against Isadore Kowal and others for dissolution of corporation. Cross bill asking specific performance of option agreement to sell stock at book value. Barlum Hotel, Inc., a Michigan corporation, added as party defendant. Decree for plaintiffs. Defendants Kowal appeal. Affirmed.

*William Henry Gallagher*, for plaintiffs.

*Clarence W. Videan*, and *Moll, Desenberg, Purdy & Glover*, for defendants.

Smith, J. This case involves a problem in corporate management. Two factions of stockholders are at swords' points and the intervention of a court of equity has been prayed.

Upon the one hand we have the plaintiffs, whom we shall refer to as the Keywell group. They own half of the outstanding stock of Barlum Hotel, Inc. The defendants are the Kowal group. They own the other half. Alleging that dissension has so wracked the 2 groups that the corporation is unable to fulfill its corporate purposes, the plaintiffs prayed dissolution of the corporation and distribution of the cash avails of its assets to the stockholders. Defendants filed answer and cross bill, the latter setting up the claim that the bill of complaint filed constituted an election on plaintiffs' part to dispose of their holdings. This, defendants asserted, brought into operation certain option provisions according to the terms of which they were entitled to buy "the shares of stock in Barlum Hotel, Inc., by plaintiffs and cross defendants owned" at book value. (There was a spread of approximately one million dollars between book value of the corporation and its actual value). Specific performance of the option provisions was, accordingly, prayed. The case went to

hearing in the Wayne circuit, the chancellor finding, generally, for plaintiffs but withholding decree for a stated period, "it being the thought of the court that these parties in the interim may see their way clear to forget past discord and dissension, eliminate their bitterness to the point where they can make a financial settlement of their problems which will be beneficial to all parties. If the parties determine that it will be of no avail to wait until that date, and persist in their stubborn and bitter attitudes toward each other, then the decree may be presented earlier." Decree was finally entered on March 21, 1956, and defendants come to us on a general appeal. Additional facts will be stated as necessary to a discussion of specific issues raised.*

It is the contention of defendants that under the facts presented, dissolution of the corporation is unwarranted, that it is not insolvent, that there has been no claim of fraud or misappropriation of assets by defendants, or dereliction in the performance of duties. Plaintiffs, on the other hand, assert that although insolvency is not now existing it is just around the corner, that the business lacks proper management and that there has been a resulting failure of corporate purpose.

As to dissension between the parties, the record is replete with instances thereof. It commenced shortly after the parties had associated themselves together, a "serious dispute" over the Chateau Frontenac Apartments, it was furthered by their competition and rival bidders for the Barlum Tower,

---

* The corporation, Barlum Hotel, Inc., was made a party defendant during the course of the trial. It should also be noted, as to parties, that on June 28, 1957, a stipulation of suggestion of death (upon May 19, 1957) of Isadore Kowal, one of the defendants, cross plaintiffs and appellants, was filed in this Court. The duly appointed and qualified administrators with will annexed were therein substituted as parties defendant, cross plaintiffs and appellants in the place and stead of decedent Kowal.

and it grew with their dispute over their interests in the Glen Apartments, at this time there being talk of "splitting up." Impetus was added by incidents connected with Henry Keywell's purchase of the Metropolitan Building, again there being talk of a division of interests. As Mr. Isadore Kowal reported it, " 'You go your way and I go mine,' he (Mr. Keywell) said, and I said 'That is all right.' " There were frequent arguments about the conduct of the Barlum Hotel business, itself, especially regarding the relative amounts of labor and management put into it by representatives of both groups. The altercations, in the opinions of the onetime hotel manager, at times reached the point where they reacted unfavorably upon the conduct of the business. He describes the situation in these terms:

"They (the Keywells and the Kowals) used to argue and quarrel quite a bit. I tried to keep out of them if I could. It didn't concern me directly. I would ask them to please go upstairs and don't annoy the guests. I thought it was bad public relations for us to have these arguments around the lobby floor. Sometimes these arguments occurred there in the ground floor office, perhaps, in my own office. They were quite disagreeable at times. I thought the heated arguments they were having there that could be overheard in the lobby was hurting the hotel. That occurred quite often. I asked them to fight it out upstairs where the public couldn't hear.
\* \* \*

"As to whether I made any attempt to bring about any placation of the fights that were going on between these families, my attitude was that it was better not to have these quarrels and arguments on the lobby floor where the guests would hear them. We were all open and you could hear it. 'If you are going to quarrel, then go upstairs and argue.' I was working for both sides and trying to keep peace with both sides. It was a difficult place to work. As

to the employees in the downstairs office hearing it.
too, it was bad for them, too, sir. It was bad for
employee morale. That went on to the day I left
there. It was continuous. Both sides were at fault,.
I would say."

In addition, certain rejected opportunities for sale
of the property added their quota to the mounting-
hostilities. Thus an offer for the hotel property for
approximately one million dollars, accompanied by
a cashier's check for $100,000 was rejected by Isadore
Kowal, it was testified by Henry Keywell, partially
upon the grounds that " 'If you (Keywell) want to·
sell, you have got to sell book credit.' " The testi-
mony continues: " 'What do you mean? You think
I am going to give you the hotel for nothing? Then
we started fighting. We didn't have a fist fight.'"
(As much cannot be said, however, of a conference·
in the latter part of September, 1950, at which time·
"our [the families'] relationship was one of actual
fisticuffs.")

The tension between the 2 senior members of the·
families, in fact, eventually became so great that
they were not talking to each other. Thus, at the·
time of what is described as "the Harris deal," they
·were talking not to each other but "at each other."
"What do you mean," asked the court, "at each
other?" The answer explains, "Well, Mr. Kowal
would ask me or ask anyone of us to ask Dad some-
thing, and by the same token, Mr. Keywell would
work it the other· way."

It would serve no useful purpose to examine in de-
tail the voluminous testimony as to each of the in-
stances of discord. We are not persuaded that fault
lies only with one side, solely with the Keywells, as
appellants urge (and we are mindful of their refusal
to attend certain corporate meetings, as well as their
asserted justification therefor), or exclusively with
the Kowals. The chancellor's finding that "they

quarreled constantly, in public and in private, in the hotel and elsewhere, over many things" finds ample support in the record, as does his conclusion, with which we are constrained to agree, that "they are at swordspoint to the extent that I don't think they will ever get together except under duress or coercion."

Conceding the dissension, however, and the bitterness, what effect, if any has it had upon the conduct of the affairs of the corporation? Here the record is clear. There have been no meetings of stockholders or directors comprising a quorum since 1950. For this state of affairs each side blames the other. There was a corporate loss in excess of $13,000 for the fiscal year ending November 30, 1954 (trial was held in 1955), and no withdrawals of profits have been enjoyed by either family since 1949. Defendant Isadore Kowal admits that the business is poorly managed and that extensive improvements are desirable. The property is run down and in need of repairs, certain of which would involve an expenditure of approximately $68,000. The bylaws are unusual: All of the stock is required to constitute a quorum for a stockholders' meeting, and all of the directors (12 in number) must be present in order to constitute a quorum for the transaction of business. We thus have a built-in guaranty that one dissident may completely obstruct desirable or necessary corporate action. The requirement of our law (CLS 1956, § 450.13 [Stat Ann 1955 Cum Supp § 21.-13]) that directors be elected annually (unless a term of more than 1 year is prescribed in the bylaws) is, and has been, ignored. This state of affairs cannot but have reacted adversely upon the corporate interests. The pleadings so concede: "Discord existing between plaintiffs and defendants has been injurious to the best interests of the corporation," (defendants answer) and "particularly since the year

1953, differences and disputes have existed between the Keywell family and the Kowal family and there has been a complete lack of the cooperation necessary for the executive and policy decisions required for the efficient operation of their mutual investment." "So," the chancellor observed, "the Barlum Hotel merely drifts along, while the 2 families look after their respective interests elsewhere. That which could be an extremely valuable piece of property over and above its present value is being permitted to deteriorate because of lack of funds, lack of interest and enmity, and one family is just as much to blame in this respect as the other."

Under these circumstances may equity decree dissolution? The question, from an historical point of view, is not without difficulty. At an earlier time, corporations received their charters from the legislatures through special acts thereof. Under such circumstances it was frequently held that the sovereign grant could only be revoked by the sovereign power. "The State gave and the State only can take away that life." *Capital City Water Company* v. *State, ex rel. MacDonald,* 105 Ala 406 (18 So 62, 29 LRA 743). The validity and applicability of such reasoning today, when the corporate charter is obtained simply through administrative process prescribed in broad statutory terms is doubtful. Moreover, a change in the customs of the business community played a significant part in the erosion of the sovereign doctrine. As the corporate device became employed for the transaction of business with increasing frequency, courts of equity were increasingly called upon, in the exercise of their traditional powers, to correct abuses in corporate management. The relief requested varied with the circumstances of the case, from the appointment of temporary receivers to the dissolution of the corporation itself. There is a noticeable trend, in cases decided since

the turn of the century, toward recognizing the inherent power of a court of equity to grant relief in proper cases. The reasons therefor were well expressed by Judge Lamm of the Missouri court in the case of *Cantwell* v. *Columbia Lead Company,* 199 Mo 1, 42, 43 (97 SW 167):

"But when all this has been said, it may further be said that this court has never denied power in a chancellor to prevent a scheme of irreparable injury and wrong, merely because the movers in that scheme speak and act in a corporate capacity rather than in an individual capacity. That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are 'frozen out,' that business immorality has run amuck under the assumption that courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis. The board of director of a corporation are but trustees of an estate for all the stockholders and may not only be amenable to the law, personally, for a breach of trust, but their corporate power under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril and the underlying, original, corporate *entente cordiale* is unfairly destroyed. It would be a sad commentary on the law if, when the trustee of a corporate estate is making an improper disposition of it, or has shown improper partiality towards one of its conflicting parties, or has put the estate in a fix it is liable and likely to be either wasted or destroyed, or mercilessly taken from all and given to a part, a court could not reach out its arm and preserve and administer the estate. We have never so declared the law."

Moreover, it will not be forgotten that the State has and retains an interest in the proper functioning of a corporation. As it has been expressed in an oft-quoted statement, "The charter (of a corpora-

tion) is a contract between the State and the corporation; second, it is a contract between the corporation and the stockholders; third, it is a contract between the stockholders and the State." 2 Cook on Corporations (5th ed), § 492. These duties of a corporation in respect of its compact with the State in the exercise of its charter privilege were well expressed by Cowen, J., in the early case of *People, ex rel. M'Kinch, v. Bristol and Rensselaerville Turnpike Company,* 23 Wend (NY) 222, 235, 236, cited in *Petition for Dissolution of Collins-Doan Company,* 3 NJ 382 (70 A2d 159, 13 ALR2d 1250). It was there held that a corporation "must come up to all the substantial objects for which it was instituted. If it depart from any one of these, it is guilty of a breach of trust. It was made a political body on the implied condition that it should demean itself faithfully and honestly in the use of all its franchises." In this respect we merely observe that we are not unmindful of what the New Jersey court in the *Collins-Doan Case, supra,* 392, described as "a flouting of the fundamental policy of the general corporation act" by this corporation's refusal or neglect to comply with the provisions of CLS 1956, § 450.13 (Stat Ann 1955 Cum Supp § 21.13), over a period of years.

This jurisdiction, from an early time, has squarely aligned itself with those jurisdictions holding that a court of equity has inherent power to decree the dissolution of a corporation when a case for equitable relief is made out upon traditional equitable principles. It is the historic function of equity to give such relief as justice and good conscience require and the fact that a corporation is involved works no diminution of the chancellor's powers. Thus we, in *Miner v. Belle Isle Ice Company,* 93 Mich 97, 117 (17 LRA 412), spoke in the following terms of the corporation then before us:

"This corporation has utterly failed of its purpose, not because of matters beyond its control, but because of fraudulent mismanagement and misappropriation of its funds. Complainant has a right to insist that it shall not continue as a cloak for a fraud upon him, and shall not longer retain his capital to be used for the sole advantage of the owner of the majority of the stock, and a court of equity will not so far tolerate such a manifest violation of the rules of natural justice as to deny him the relief to which his situation entitles him."

The general principle applicable under such circumstances was well stated in terms equally applicable today (pp 112, 113):

"The general rule undoubtedly is that courts of equity have no power to wind up a corporation, in the absence of statutory authority. This rule is, however, subject to qualifications. It has been held that, when it turns out that the purposes for which a corporation was formed cannot be attained, it is the duty of the company to wind up its affairs; that the ultimate object of every ordinary trading corporation is the pecuniary gain of its stockholders; that it is for this purpose, and no other, that the capital has been advanced; and if circumstances have rendered it impossible to continue to carry out the purpose for which it was formed with profit to its stockholders, it is the duty of its managing agents to wind up its affairs. To continue the business of the company under such circumstances would involve both an unauthorized exercise of the corporate franchises and a breach of the charter contract. Morawetz, Corporations, §§ 217, 407. The rule applicable in cases of a copartnership has been held to apply in case of a corporation or joint-stock company."

Although the *Miner Case* speaks of fraud, abuse of trust, misappropriation of corporate funds, and fraudulent mismanagement, we do not take the prin-

ciple to be so restricted. In fact in the case of *Flemming* v. *Heffner & Flemming,* 263 Mich 561, we considered its application to be a deadlocked corporation. Here one stockholder, having half the stock, excluded the other 50% owner from any control of the corporation, the bill setting up various alleged abuses (conspiracy to control corporate funds, "freeze-out," et cetera). After quoting from the *Miner Case, supra,* we spoke as follows with respect to dissension in a corporation (pp 567, 568):

" 'When dissension among those in charge of a corporation gets too bad, it is necessarily impossible for the corporation to attain the objects for which it was formed and failure is inevitable.

" 'Defendant insists that a corporation can only be dissolved upon suit of the State or by following certain statutory procedure. This is doubtless true when it is sought to accomplish a *de jure* dissolution. A *de facto* dissolution or winding up of a corporation's business and distribution of its assets may, however, be effected through the chancery court in other suits.' (Citing authorities.) *Nashville Packet Co.* v. *Neville,* 144 Tenn 698 (235 SW 64).

"There are many authorities which uphold the power of a court of chancery to dissolve a corporation because of dissensions of so serious a character as under the circumstances will inevitably defeat the purpose for which it was created Especially is such the holding in cases where there are only a few stockholders, so that the corporation for practical purposes, as between those interested, is much like a partnership."

Appellants seek to distinguish *Flemming* upon factual and procedural differences. They do not impeach the principle. See *Petition of Collins-Doan Co., supra,* 396 (noting that the statute there involved "is but a declaration of a power existing at common law"); *Cowin* v. *Salmon,* 248 Ala 580 (28 So2d 633); *Guaranty Laundry Co.* v. *Pulliam,* 200

Okla 185 (191 P2d 975); *Nashville Packet Co.* v. *Neville,* 144 Tenn 698 (235 SW 64). Appellants also urge, particularly with respect to these cases, that a court of equity has no power apart from statute to order dissolution of a corporation "simply" on the ground of deadlock or dissension and that this jurisdiction has never done so. The difficulty with this argument is that we are not considering a case of dissension of deadlock alone, nor did *Flemming, supra.* As a matter of fact, a careful review of the cases cited to us by both of the parties hereto reveal that when the stockholders, of a corporation become so engrossed in their personal enmities that they will not speak to each other, that they refuse to cooperate in the management of the business, and ignore the statutory requirements for doing business in the corporate form, such dissension rarely, if ever, stands alone. It is usually accompanied by circumstances of financial loss, corporate paralysis, mismanagement and deterioration of property, all of which we have here. It is true that we held in *Stott Realty Co.* v. *Orloff,* 262 Mich 375, a minority stockholders' suit, that in the absence "of all such exceptional circumstances" an equity court may not dissolve a corporation. But this is not a minority stockholders' suit and the exceptional circumstances referred to are here in abundance. A showing of insolvency is not essential to equity's action under these circumstances, *Green* v. *National Advertising & Amusement Co.,* 137 Minn 65 (162 NW 1056, LRA1917E, 784), nor is statutory authorization necessary. As was said in *Petition of Collins-Doan Company, supra* (p 396):

"In the case at hand, there is a want of that community of interest essential to corporate operation. Dissolution will serve the interests of the shareholders as well as public policy. The interests of the shareholders are so discordant as to preclude efficient management for the welfare of all, not to mention

the complete lack of direction in the corporate form. It would seem that this particular statutory provision for dissolution is but a declaration of a power existing at common law."

Appellants also urge upon us that the filing by plaintiffs of their bill of complaint for dissolution brought into operation certain option provisions pertaining to transfers of interests in the corporation. The exhibits involved are those identified in the record as exhibits 1, 2 and 3.. They will be considered in detail.   Exhibit 1 bears date of January 5, 1943. (Its precise relationship with exhibit 29, described by appellants as being in the nature of a preincorporation agreement, we need not explore.)   It was entered into between Isadore and Meyer Kowal, as first parties, Henry C. Keywell and Kopel I. Kahn as second parties, with Barlum Hotel, Inc., as third party.   It recited the purchase of the Barlum Hotel Building, the formation of the corporation (third party), agreement as to stock subscriptions, sums to be invested, issuance of stock, certain bylaw provisions, salaries and bonuses, and also the following:

"Seventh: That if any of the parties of the first or second parts or their nominee, or nominees dies, is declared a bankrupt, or desires to sell, assign or transfer voluntarily or involuntarily, directly or indirectly, his or her interest now possessed or that may be acquired in the future under this agreement and in the premises, both real and personal property, including capital stock interest in the party of the third part, same shall be first offered in writing by an irrevocable offer, upon the same terms and conditions he, she or they are willing to accept or can obtain from an outsider, or at book value according to the results of the last audit made by an independent certified public accountant, whichever is lower, as follows, in the following order:

"(a) First, for a period of 15 days to his or her spouse and his or her child or children, if any, equal-

ly, or at their option in any other proportion that they may agree upon.

"(b) Second, if not in whole or in part accepted by those mentioned in (a), the whole or balance shall be offered for a period of 15 days to the remaining members of his, her or their family in the proportions that they already and still possess, or at their option in any other proportion they may agree upon.

"(c) Third, if not in whole or in part accepted by those mentioned in (a) or (b), the whole or balance shall be offered for a period of 30 days to the other remaining parties hereto, in the proportion that they already and still possess, or at their option in any other proportion they may agree upon."

The last quoted provision, it is noted, contains a unique provision, namely, that the stock shall be offered to the specified parties upon the same terms or conditions obtainable from an outside offer, or the book value, whichever is the lower. Where, as here, there is a spread of approximately one million dollars between book and actual value this clause contains explosive potentialities, as the lengthy record before us amply attests. It is also to be noted that this agreement speaks of a time prior to the issuance of stock (the parties "contemplate designating the stock to be issued" in prescribed proportions) and it refers in terms to the interests of the parties as "real and personal property, including capital stock interest" in the third party.

Exhibit 2 is a copartnership agreement, entered into, as may be seen, by certain persons in addition to the 4 natural persons, who were parties to exhibit 1, namely,

"by and between Isadore Kowal and Minnie Kowal, his wife, Meyer Kowal, and Isadore Kowal, trustee for Jerry Kowal, of Detroit, Wayne county, Michigan, hereinafter referred to as the parties of the first part; and Henry C. Keywell and Rose Keywell, his wife, Kopel I. Kahn and Sylvia Estelle Kahn, his

wife, Phillip Levant and Ethel Levant, his wife, Henry C. Keywell as trustee for Jerome Keywell (now in the Army of the United States), of the same place and hereinafter referred to as parties of the second part; and Isadore Kowal and Henry C. Keywell, doing business as Barlum Hotel Operating Company, a copartnership, hereinafter referred to as the party of the third part."

The option provision of this instrument is similar to that of exhibit 1 save that the "interest" described relates to "both real and personal, and mixed property."

The copartnership described (later dissolved) leased the hotel and operated it until January 31, 1950, at which time the leasehold interest and business were sold to the corporation in consideration of the issuance of capital stock thereof. In the words of the chancellor: "The liabilities of the partnership were assumed and shares of stock were authorized to be issued to the copartnership in a par value amount equal to the net worth of the partnership as of January 31, 1950, in payment for such property and assets." On this date, also, the agreement described in the record as exhibit 3 was executed. This agreement contemplated that certain additional members of the Kowal and Keywell families would be admitted as shareholders of the corporation and it was executed in confirmation of the purchase of the leasehold interest of the partnership; certificates were, accordingly, issued in accordance with a percentage interest then held by the parties in the corporation and the partnership. Exhibit 3 contained an option provision similar to those previously described, but again there was a difference: it, by its express terms, referred to the "interest now possessed or that may be acquired in the future" as "being the capital stock owned by any of the parties hereto at any time." In addition, as distinguished

from exhibit 1, the parties to exhibit 3 are 13 in number, rather than the 4 described in exhibit 1. The option provisions of exhibit 3, then, are inconsistent with and have superseded those of exhibit 1 and such provisions of the former instrument will here control.

It is the argument of the appellants, with respect to such option provisions, that plaintiffs' filing of the bill of complaint in the instant case, which prayed "that said corporation be dissolved and its assets disposed of under the direction of this court and that the proceeds thereof be distributed among the stockholders in proportion to their respective interests therein," brought into operation the afore-described option provisions, permitting them to buy out the plaintiffs at the book value of the stock. This, it is urged, is because such bill of complaint gave notice, in their words, of plaintiffs' "desire to sell, assign or transfer voluntarily or involuntarily, directly or indirectly, his or her interest now possessed or that may be acquired in the future under this or any other agreement then in effect, said interest being the capital stock owned by any of the parties hereto." Appellants further urge that they have exercised their rights under such option, that appellees have refused to perform, and that they, appellants, are thus entitled to specific performance.

The language employed permits no such construction. The option provision is directed at a transfer of the only interests plaintiffs then had in the corporation, namely, its capital stock. This the plaintiffs are not attempting to sell or transfer. What they are praying is that the court sell the assets, not that the parties sell their stock. The provision before us is manifestly intended to restrict the membership of a going corporate business and has no application to a court-ordered dissolution and distribution. It looks at corporate life, not death. (As

Isadore Kowal testified, "We couldn't sell to strangers but keep it myself or the other family and it be a closed corporation and the stock shall not be transferable.") It is true, as appellants urge, that stockholders are the owners of the enterprise, but this is an equitable ownership, not the ownership of assets as such. As Fletcher puts it in his treatise:

"A share of stock is one of the proportionate integers or units of the capital stock, and is the interest or right which the owner or holder thereof has in the management of the corporation and to share in the profits thereof and in the property and assets thereof on dissolution, after the payment of the corporate debts and obligations." (11 Fletcher, Corporations, § 5083, p 28.)

"Shares of stock do, however, represent an interest in the corporate property. Thus, it has been said that stockholders are the equitable owners of the property and assets of the corporation, and that they have a proprietary interest in the corporation; a qualified beneficial interest which is an indirect or collateral interest in the corporate property." (11 Fletcher, Corporations, § 5100, p 93.)

It is thus clear that plaintiffs' prayer that the assets be distributed cannot be construed as appellants urge. The cases cited to us, involving partition of real estate and specific performance of land contracts are not in point. A prayer for dissolution and distribution of corporate assets is not expressive of an offer or desire to transfer the capital stock of the corporation. If the parties to a business enterprise choose to adopt the corporate form of activity they must do so in its entirety which simply means, for our purpose, that the corporation itself owns the assets, and the shareholders the stock.

The balance of the issues raised by appellants are without merit and in view of the opinion above expressed it is unnecessary to rule upon the matter of

perpetuities or unreasonable restraints upon alienation.

Affirmed.  Costs to appellees.

Dethmers, C. J., and Sharpe, Edwards, Voelker, Kelly, Carr, and Black, JJ., concurred.