CITY OF BRONSON v AMERICAN STATES INSURANCE
COMPANY

Docket No. 175170. Submitted December 12, 1995, at Grand Rapids.
Decided February 27, 1996, at 9:20 A.M.

The City of Bronson brought an action in the Branch Circuit
Court against American States Insurance Company and two
other insurers, seeking a declaration that the defendants have
a duty to defend the plaintiff against allegations by the United
States Environmental Protection Agency regarding environ-
mental contamination at the North Bronson Industrial Area.
The insurers had insured the plaintiff at various times from
1969 to 1985 with policies that insured against "occurrences"
and defined an "occurrence" as "an accident, including continu-
ous or repeated exposure to conditions, which results in bodily
injury or property damage neither expected nor intended from
the standpoint of the insured." Some of the policies also con-
tained a pollution exclusion clause that barred coverage for the
release of contaminants, except "if such discharge, dispersal,
release or escape is sudden and accidental." The court, Michael
H. Cherry, J., granted summary disposition for the defendants.
In its ruling, the court also held that the defendants did not
have a duty to defend the plaintiff against possible claims by
the EPA regarding possible environmental contamination at the
Bronson Sanitary Landfill, a separate parcel located some
distance from the North Bronson Industrial Area. The plaintiff
appealed.

The Court of Appeals *held:*

1. The trial court erred in ruling with regard to the defend-
ants' duty to defend against possible claims concerning the
landfill. The issue was not raised in the parties' pleadings and
the plaintiff did not consent to the inclusion of the claims
concerning the landfill. The portions of the judgment purport-
ing to decide the insurers' obligations concerning the landfill
must be vacated.

2. The trial court properly concluded that no "occurrence"

REFERENCES

Am Jur 2d, Insurance §§ 555, 559, 562; Pleadings §§ 361, 366.
See ALR Index under Insurance and Insurance Companies; Plead-
ings.

took place because the plaintiff knew by 1950 that environmental contamination was occurring at the North Bronson Industrial Area and continued to operate the lagoons at the area despite knowledge that their use could cause further environmental contamination. The record also supports the trial court's conclusion that, even if there had been an "occurrence" within the meaning of the policies, coverage would still be barred, and the duty to defend obviated, under the pollution exclusions contained in all but one policy because this case did not involve a "sudden and accidental" release of contaminants into the groundwater. The release of contaminants occurred over decades during which the plaintiff intentionally and continuously collected toxic wastes in the lagoons while on notice that the lagoons were the source of groundwater pollution. Because the release of contaminants was not unexpected, as a matter of law, it cannot be "sudden and accidental."

Affirmed in part and vacated in part.

1. PLEADING — TRIAL — ISSUES NOT RAISED IN PLEADINGS — CONSENT.

Issues that are not raised by the parties in their pleadings may be decided by a trial court only with the parties' consent (MCR 2.118[C]).

2. INSURANCE — POLICY EXCLUSIONS — DAMAGE EXPECTED OR INTENDED BY INSURED.

In determining whether, pursuant to the terms of an insurance policy, damage was expected or intended from the standpoint of the insured, the insured's actions are analyzed subjectively from the standpoint of the insured; this analysis requires, first, an inquiry whether the insured's conduct, from the perspective of the insured, evidenced an intent to cause the damage, and, second, an inquiry whether the insured had the awareness that harm was likely to follow from the performance of its actions.

*Warner Norcross & Judd LLP* (by *Robert J. Jonker* and *Elizabeth M. Topliffe*), for the City of Bronson.

*Holahan, Malloy, Maybaugh & Monnich* (by *John R. Monnich* and *Maureen Holahan*) (*Bingham Summers Welsh & Spilman,* by *Martha S. Hollingsworth,* of Counsel), for American States Insurance Company.

*Timmis & Inman* (by *Mark W. Peyser*), for Transamerica Insurance Company.

Amicus Curiae:

*Kelley, Casey & Clarke, P.C.* (by *Stephen M. Kelley*) (*Wiley, Rein & Fielding*, by *Laura A. Foggan, Daniel E. Troy*, and *J. Stephen Zielezienski*, of Counsel), for Insurance Environmental Litigation Association.

Before: HOEKSTRA, P.J., and MACKENZIE and R. L. TAHVONEN,* JJ.

PER CURIAM. Plaintiff purchased general liability insurance policies from each of defendant insurers at various times spanning from 1969 to 1985. In 1986, the United States Environmental Protection Agency sent plaintiff a letter claiming that plaintiff may be a party potentially responsible for environmental contamination at the North Bronson Industrial Area. Plaintiff subsequently filed this declaratory judgment action, seeking a ruling that defendants had a duty to defend plaintiff against the EPA's allegations regarding the North Bronson area. Plaintiff appeals as of right from the trial court's order granting summary disposition for defendants pursuant to MCR 2.116(C)(10). We affirm in part and vacate in part.

I

American States Insurance Company was plaintiff's insurer from July 1, 1969, through July 1, 1978. Coverage consisted of three policies that insured plaintiff against "occurrences," and defined an "occurrence" as "an accident, including

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The two policies that were in effect from July 1, 1972, through July 1, 1978, also contained a pollution exclusion clause that barred coverage for the release of contaminants, except "if such discharge, dispersal, release or escape is sudden and accidental."

Transamerica Insurance Company issued plaintiff a series of three policies covering it from July 21, 1978, through July 1, 1985. Like the American States policies, each of these policies defined a covered "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Each Transamerica policy also included a pollution exclusion clause that precluded coverage for the release of contaminants unless "such discharge, dispersal, release or escape is sudden and accidental."

## II

Plaintiff owned and operated three separate sewage and wastewater systems: (1) a conventional sanitary sewer system and sewage treatment plant, (2) a storm sewer system discharging into an open drainage ditch known as County Drain No. 30, and (3) an industrial waste disposal system consisting of wastewater seepage ponds or lagoons located at the North Bronson Industrial Area. This case primarily involves the industrial waste disposal system.

The North Bronson Industrial Area is the site of several electroplating companies. Before 1939, the untreated industrial waste from these companies

was discharged directly into plaintiff's storm sewer system and then flowed into County Drain No. 30. In 1931, cattle were killed by drinking water from the drain. Plaintiff's industrial waste disposal system was built in 1939. With this system, the untreated industrial waste generated by three electroplating companies was transported by connecting sewers to plaintiff's waste lagoons, referred to as the "old" lagoons. In 1944, the system overflowed into the storm sewer system, releasing cyanide and causing two serious fish kills and another cattle kill. In the late 1940s, a fourth electroplating company began operations at the industrial area. A "new" set of lagoons was constructed during this period. By 1949, however, the system was near complete failure. According to one report, plating wastes were observed bubbling out of manholes and running down the streets.

In December 1949, the county received a report that water from a well located near the disposal ponds had a "steadily increasing green color." After analysis revealed the presence of cyanide, chromium, and nickel, the water was declared unsafe. The contamination was identified as plating waste and was traced to the new lagoon system. In February 1950, a hearing was held before the Water Resources Commission regarding the lagoons' pollution of the groundwater. At that time, evidence was presented that the old and new lagoons were contaminating the groundwater.

By the early 1950s, two of the electroplating companies continued to discharge their waste into the lagoons; the remaining two companies installed waste recovery equipment or cyanide treatment facilities that were connected to the storm sewer system and County Drain No. 30 rather than the lagoons. An additional pond was added to the new lagoon system in 1954. A 1955 Water

Resources Commission report indicates, however, that cyanide was seeping from the new lagoons, through the ground, and into County Drain No. 30. Another series of four fish kills took place in 1961 and 1962. Plaintiff finally ceased operating the new lagoons in 1969, when it sold them to Bronson Plating Company. Plaintiff still owns the old lagoons.

In April 1986, the EPA notified plaintiff that contaminants had been found at the North Bronson Industrial Area, and that, as an owner or operator of the old and new lagoons, plaintiff was a potentially responsible party that "may be liable for all costs associated with the removal or remedial action and all other necessary costs incurred in cleaning up the site."

III

Plaintiff also owns the Bronson Sanitary Landfill, a separate parcel located some distance south of the industrial area. Plaintiff purchased the site in 1963 and allowed an individual, Paul Hand, to use the site for his refuse disposal service until 1973. During the time Hand used the site, various companies—including the four electroplating companies located at the industrial area site—apparently had direct access to the landfill and used it for waste disposal. The Department of Public Health inspected the landfill in 1971 and 1972 and determined that leachate in the landfill had caused groundwater contamination. The landfill was closed in 1973. Since then, plaintiff has used the site for the disposal of leaves.

In May 1986, plaintiff received a letter from a contractor for the EPA requesting permission to inspect the site in the belief that it might contain plating wastes and detergents causing additional

groundwater contamination. At the time of the proceedings in this case, the EPA had not yet determined if the site required remediation.

## IV

On September 18, 1987, plaintiff filed a complaint for declaratory judgment alleging that the insurers had a duty to defend it in the proceedings before the EPA regarding the industrial area. Each of the insurers responded with a motion for summary disposition pursuant to MCR 2.116(C)(10), arguing that defendants had no duty to defend with regard to either the industrial area or the landfill. The trial court concluded that, although plaintiff's complaint pertained only to the industrial area and not the landfill, it would be "more helpful to all of the parties" to address coverage with regard to both sites. The court ruled that (1) because plaintiff knew that hazardous substances were being disposed of at the industrial area and at the landfill and expected that this disposal could result in contamination, there was no "occurrence" for purposes of any of the policies, (2) because the pollution was not sudden and accidental, coverage was barred under the pollution exclusions contained in all policies except American States' first policy, and (3) the known loss and loss in progress doctrines precluded any coverage or duty to defend.

## V

As a threshold matter, we address plaintiff's claim that the trial court erred in ruling with regard to defendants' duty to defend in any EPA proceedings involving the landfill. As noted by plaintiff, it never sought declaratory relief with

regard to the EPA's investigation of the landfill, and defendants never filed a counterclaim seeking a determination concerning their duty to defend in any possible proceedings regarding the landfill. Further, plaintiff objected to inclusion of any arguments concerning the landfill as premature and beyond the scope of the pleadings. Under these circumstances, we agree that the trial court erred in ruling with regard to defendants' duty to defend against possible claims concerning the landfill.

By ruling with regard to defendants' duty to defend as it related to the landfill site, the court effectively sua sponte amended plaintiff's complaint to add an additional claim. While issues not raised in the pleadings may be decided if the parties consent, see MCR 2.118(C) and *Goins v Ford Motor Co,* 131 Mich App 185, 195; 347 NW2d 184 (1983), here plaintiff specifically did not consent to the inclusion of the claims concerning the landfill in the action. The claims regarding the landfill involved a parcel of property distinct and distant from the industrial area, a different level of EPA activity, a different factual history, a different method of waste disposal, and the active participation of at least one additional individual, Mr. Hand, who apparently had no involvement in the industrial area disposal system. In light of the differences between the two sites and the failure of the parties to include claims regarding the landfill site in their pleadings, we must conclude that the court's judgment exceeded the scope of the case. Accordingly, we vacate those portions of the judgment purporting to decide the insurers' obligations concerning the landfill.

VI

Plaintiff also contends that the trial court incor-

rectly concluded that, with regard to the industrial area, there was no "occurrence" under defendants' policies. This claim is without merit.

As previously noted, the policies at issue in this case defined an occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." In determining whether damage is expected or intended, an insured's actions are analyzed subjectively from the standpoint of the insured. *Arco Industries Corp v American Motorists Ins Co,* 448 Mich 395, 407-409; 531 NW2d 168 (1995). This analysis requires, first, an inquiry whether the insured's conduct, from the perspective of the insured, evidenced an intent to cause contamination to the environment, and, second, an inquiry whether the insured had the awareness that harm was likely to follow from the performance of its actions. *Id.,* pp 409-410.

In this case, the trial court noted "a pattern of deliberate and purposeful activity which preceded any and all of the Defendants' policies of insurance, not by weeks, months, years, but indeed by decades." The court further found that plaintiff "knew that hazardous wastes were intentionally disposed of at the North Bronson Industrial Area . . . over a period of many years, and knew that such disposals [sic] could result in environmental contamination."

A review of the evidence presented in support of the motions for summary disposition, giving the benefit of all reasonable doubt to plaintiff, *Michigan Mutual Ins Co v Dowell,* 204 Mich App 81, 85; 514 NW2d 185 (1994), supports the trial court's conclusion. Plaintiff intended to dispose of the contaminants by collecting them and placing them in the lagoons. Unlike *Arco, supra,* where "the

extent of contamination was unknown with respect to [volatile organic compounds] during the periods in question," *id.,* p 412, n 9, plaintiff in this case had been notified as early as 1950 that the lagoons were contaminating the groundwater. Plaintiff was also aware of the fish and cattle kills and the well contamination in the vicinity of the lagoons. Despite evidence before the Water Resources Commission in 1950 that both the old and the new lagoons were contaminating the groundwater and would continue to do so, plaintiff continued to operate the wastewater lagoons until 1969. Because plaintiff knew by 1950 that the lagoons were causing groundwater contamination and continued to operate the lagoons despite knowledge that their use could cause further environmental contamination, the trial court properly concluded that no "occurrence" took place. In the absence of an occurrence, coverage was not possible and defendants had no duty to defend plaintiff under any of the policies at issue. *Auto-Owners Ins Co v City of Clare,* 446 Mich 1, 16; 521 NW2d 480 (1994).

Our disposition of this issue makes it unnecessary to consider plaintiff's remaining claims. We note, however, that the record also supports the trial court's conclusion that, even if there had been an "occurrence" within the meaning of the policies, coverage would still be barred, and the duty to defend obviated, under the pollution exclusions contained in all but one policy because this case did not involve a "sudden and accidental" release of contaminants into the groundwater. The evidence clearly showed that the release of contaminants at the industrial area occurred over decades during which plaintiff intentionally and continuously collected toxic wastes in the lagoons while on notice that the lagoons were the source of groundwater pollution. The term "sudden and acci-

dental" is unambiguous; " 'sudden' includes both a temporal element and a sense of the unexpected; the word 'accidental' means unexpected and unintended." *Id.,* p 12; *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 201; 476 NW2d 392 (1991). Because the release of contaminants in this case was not unexpected, as a matter of law, it cannot be "sudden and accidental." *Id.,* pp 216-217. See also *Matakas v Citizens Mutual Ins Co,* 202 Mich App 642; 509 NW2d 898 (1993); *Traverse City Light & Power Bd v Home Ins Co,* 209 Mich App 112; 530 NW2d 150 (1995). Coverage, therefore, would also be barred by defendants' pollution exclusion.

Affirmed in part and vacated in part.