*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GAYLORD ALPINE INVESTMENTS, INC., and
MAIN I-75 INVESTMENT, LLC,

UNPUBLISHED
May 26, 2022

Plaintiffs-Appellees,

v

No. 356344
Otsego Circuit Court
LC No. 20-018143-CK

MERCY PROPERTIES, LLC,

Defendant-Appellant.

Before: GLEICHER, C.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

In this contractual dispute involving the sale of real property, defendant appeals by right the trial court's order granting plaintiffs' second motion for summary disposition under MCR 2.116(C)(10). We affirm.

## I. BACKGROUND

The material facts of this case are not in dispute. On January 30, 2017, defendant sold a hotel, the American Alpine Lodge (the Property), on land contract (the Land Contract) to plaintiff Main I-75 Investment, LLC (Main). That same day, defendant and plaintiff Gaylord Alpine Investments, Inc. (Alpine), executed a promissory note (the Note) in which Alpine agreed to pay defendant a sum of money in return for the Property's personal property assets. Main and Alpine were, at the time, each made up of the same five members and shareholders: Ayad Kashat, Ghanim Kashat, Manhal Kashat, Sermad Yousef, and Amar Jarbo. Central to this appeal, paragraph 2 of the parties' contracts[1] provided, in relevant part, that certain triggering conditions would impose a prepayment penalty upon plaintiffs:

---

[1] There were three contractual documents at issue in this case: the Land Contract, the Note, and a purchase agreement. However, all three contained identical language regarding the prepayment

c. If, at any time during the term of the land contract and promissory note (hereinafter the "debt"), purchaser refinances the debt with the intention to pre-pay all or any part of the debt prior to the term provided in the land contract and promissory note, purchaser shall pay to seller a prepayment penalty in accordance with the following:

i. Within 1-3 years of the date of closing, a pre-payment penalty in an amount representing 35% of the then owing unpaid principal balance of the land contract and promissory note, together with the then owing unpaid principal balance of the land contract and promissory note.

\* \* \*

d. If, during the term of the land contract and promissory note, purchaser sells, conveys, assigns or transfers all of the legal or equitable title or interest in the premises, pursuant to an arm's length transaction, purchaser shall not be required to pay to seller a pre-payment penalty.

e. If, during the term of the land contract and promissory note, purchaser sells, conveys, assigns or transfers all, or any part, of the legal or equitable title or interest in the premises, that is not an arm's length transaction, purchaser shall pay to seller a pre-payment penalty in accordance with paragraph c.

f. An arm's length transaction is a transaction between unrelated parties who are not involved in a confidential relationship and who have equal bargaining power. An arm's length transaction is characterized by four elements: (1) it is voluntary, i.e., without compulsion or duress; (2) it takes place in an open market; (3) the parties act in their own self-interest; and (4) the parties act independently and have no relationship by blood, marriage or subsidiary business interests.

g. Upon the signing of any agreement to sell, convey, assign or transfer all, or any part, of the legal or equitable title or interest in the premises, purchaser shall promptly provide seller with a copy of all transfer documents. Purchaser shall further promptly provide seller the identification and contact information of all parties, shareholders, members, partners and individuals to the agreement. Failure of the purchaser to comply with this paragraph shall obligate purchaser to pay seller a pre-payment penalty in accordance with paragraph c.

In March 2018, another individual, Masen Yacoub, purchased a 15% membership interest in Main and 1500 stock shares in Alpine (the Yacoub transactions). In November 2019, Ghanim Kashat transferred his 10% membership interest in Main to Ayad Kashat and sold 1000 stock shares in Alpine to Ayad Kashat (the Kashat transactions). At the same time, Ghanim also resigned as the director of Alpine. There is no dispute that plaintiffs did not notify defendant of these

---

penalty provision. Defendant on appeal largely refers only to the paragraphs of the Land Contract, and we will do the same for consistency and brevity.

transactions. Plaintiffs subsequently attempted to sell the Property to another entity, ARD Mahant, LLC (Mahant), but defendant refused to take the necessary steps to allow closing. Mahant was made up of a sole member: Ankit Tiwari. Defendant's actions prompted plaintiffs to file this lawsuit alleging breach of contract and promissory note.

In its defense, defendant challenged the Yacoub and Kashat transactions, arguing that they triggered the prepayment penalty provision and entitled defendant to both the penalty and the amount needed to pay off the Land Contract and Note. Defendant contended that plaintiffs' failure to notify defendant of the Yacoub and Kashat transactions triggered paragraph 2g. Plaintiffs countered that the Yacoub and Kashat transactions fell outside the prepayment penalty provisions and that defendant was entitled to only the amount needed to pay off the Land Contract and Note. As defendant summarizes on appeal, the parties disputed how much money plaintiffs owed to defendant in order to pay off the Land Contract and Note.

Both parties sought summary disposition under MCR 2.116(C)(10), and the trial court sided with plaintiffs' interpretation of the contracts. The trial court ruled that the language was plain and unambiguous, and it did not cover the transactions involving plaintiffs' membership or shareholder interests. After the trial court's ruling, defendant continued to prevent plaintiffs from closing their sale with Mahant, which prompted plaintiffs to file a second motion for summary disposition under MCR 2.116(C)(10). In its response, defendant contended that new information had arisen showing that Yacoub was related to one of the other Main members, thereby implicating the arms-length transaction paragraphs of the Land Contract.[2] Defendant also raised a new argument that the reshuffling of Alpine's and Main's memberships constituted refinancing for the purpose of pre-paying the debt, implicating paragraph 2c. Plaintiffs contended that the trial court had already ruled against defendant and that the new information changed nothing. The trial court agreed and granted plaintiffs' second motion for summary disposition.

## II. STANDARD OF REVIEW AND PRINCIPLES OF LAW

"This Court reviews de novo a trial court's decision on a motion for summary disposition, as well as questions of statutory interpretation and the construction and application of court rules." *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). A motion is properly granted pursuant to MCR 2.116(C)(10) when "there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 415. This Court "must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists," meaning "reasonable minds could differ as to the conclusions to be drawn from the evidence." *Id.* at 415-416. "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

---

[2] There is no concrete allegation that any of the original or reconstituted members of Alpine or Main were related to Tiwari. Although defendant suggested in the trial court that the sale to Mahant *might* not have been an arms-length transaction, that concern was presumably resolved. In any event, although defendant's brief on appeal is very difficult to follow, defendant does not appear to make any such argument in this Court.

"Moreover, questions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo." *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). Whether a contract is ambiguous is a question of law. *Port Huron Ed Ass'n, MEA/NEA v Port Huron Area Sch Dist*, 452 Mich 309, 323; 550 NW2d 228 (1996). If it is unambiguous, then its interpretation is likewise a question of law. *Id*. However, if the contract is open to one or more reasonable interpretations or otherwise unclear, then it is ambiguous, and its meaning is a question of fact. *Id*. When interpreting a contract, it "should be read as a whole, with meaning given to all of its terms." *Detroit Pub Sch v Conn*, 308 Mich App 234, 252; 863 NW2d 373 (2014). "A contract must be interpreted according to its plain and ordinary meaning." *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership (On Remand)*, 300 Mich App 361, 386; 835 NW2d 593 (2013) (quotation marks and citation omitted).

Generally, the proponent of a position has the burden to establish facts supporting that position, *In re Portus*, 325 Mich App 374, 393; 926 NW2d 33 (2018), and the appellant has the burden to establish the basis for appellate relief, *Petraszewsky v Keeth*, 201 Mich App 535, 540; 506 NW2d 890 (1993).

## III. ALLEGED TRANSFER OF OWNERSHIP

Defendant first argues that the internal membership transactions, wherein Yacoub bought into Main and Alpine, and Ghanim Kashat sold out to Ayad Kashat, constituted a transfer of an interest in the Property. Defendant contends that the Yacoub and Kashat transactions violated paragraph 2e because they were not arms-length transactions, and they violated paragraph 2g because plaintiffs failed to provide defendant with all transfer documents and identification materials. Defendant therefore contends that plaintiffs are obligated to pay the prepayment penalty set forth in paragraph 2c. We disagree.

Both paragraphs 2e and 2g explicitly refer to transferring an "interest *in the premises*." As discussed, this refers to the Property. It is undisputed that defendant, as the land contract vendor, holds legal title to the Property, and plaintiffs hold equitable title to the Property. See *Hooper v Van Husan*, 105 Mich 592, 597; 63 NW 522 (1895). The only relevant transfer of interest in the Property, however, is the intended sale by plaintiffs to Mahant. Defendant's argument seeks to conflate plaintiffs' members with plaintiff itself, in contravention of longstanding principles of corporate law.

It has been long established that a corporation is a discrete entity distinct from its stockholders, and the assets and property of a corporation belong to the corporation rather than to the stockholders. *Bourne v Sanford*, 327 Mich 175, 191; 41 NW2d 515 (1950). The same principles apply to limited liability companies. *Salem Springs, LLC v Salem Twp*, 312 Mich App 210, 223; 880 NW2d 793 (2015). Although stockholders or members have been described as possessing an equitable interest—of a sort—in the corporation's assets, they only own stocks in the corporation and do not have a true ownership interest in the corporation's assets. *Levant v Kowal*, 350 Mich 232, 249; 86 NW2d 336 (1957). Even that equitable interest is indirect and essentially contingent: shareholders or members have no actual right to any of a corporation's assets until such time as the corporation is dissolved and all of the corporation's outstanding debts are paid from its assets. See *id*.; see also *Grand Rapids Trust Co v Carpenter*, 229 Mich 582, 587-588; 201 NW 882 (1925). In the meantime, "a corporation may, in the absence of legislative

restriction, deal with its property precisely as an individual may." *Bank of Montreal v JE Potts Salt & Lumber Co*, 90 Mich 345, 350; 51 NW 512 (1892). The corporation's right to manage or dispose of its property belongs to the corporation, not to the shareholders or members; the shareholders or members retain the right to assign or transfer their stock. *City of Detroit v Mutual Gaslight Co*, 43 Mich 594, 599-603; 5 NW 1039 (1880).

Defendant argues that this Court has held otherwise. In *Signature Villas, LLC v Ann Arbor*, 269 Mich App 694; 714 NW2d 392 (2006), this Court addressed

> whether the sale of all the membership interests in a limited liability corporation (LLC) that owns all the membership interests in another LLC that owns real property constitutes a "transfer of ownership" of the property *within the meaning of the General Property Tax Act* (GPTA), MCL 211.1 *et seq.*, which permits the taxable value of property to be reassessed in conformity with the state equalized value upon a transfer of ownership of the property. [*Id.* at 696 (first emphasis added).]

This Court concluded that the sale did constitute a transfer of ownership, as defined under the GPTA. *Id.* at 699-702.

However, there is longstanding precedent for partially ignoring the corporate form for purposes of taxation, and specifically for the purposes of avoiding double-taxation. See *Lenawee Co Savings Bank v City of Adrian*, 66 Mich 273, 275; 33 NW 304 (1887). Furthermore, the transaction at issue in *Signature Villas* involved the purchase of the *entirety* of a corporate entity that owned the property at issue, not merely some shares. *Signature Villas*, 269 Mich App at 697. Most importantly, if a contract or a statute provides its own definition for a term, the Courts must follow that definition, however idiosyncratic; otherwise, words will be given their ordinary and common meanings. *Cavalier Mfg Co v Employers Ins of Wausau*, 222 Mich App 89, 94; 564 NW2d 68 (1997); *People v Smith*, 246 Mich 393, 396; 224 NW 402 (1929). The contract in this matter only provides, in relevant part, a definition of what constitutes an arms-length transaction. This Court's determination in *Signature Villas* on the basis of a statutory definition and in the context of taxation is therefore of doubtful relevance.

To the extent defendant's arguments turn on the erroneous belief that a transfer of shares in a corporation constitutes a transfer of any real interest in the corporation's property, defendant's arguments are untenable. It is therefore irrelevant whether the Yacoub and Kashat transactions were at arms-length, or whether plaintiffs provided defendant with transfer documents and identification materials relevant to those transactions. Although we, like the trial court, appreciate defendant's reasonable concerns with knowing the identity of the individuals involved in the sale of the Property, such a requirement could easily have been drafted into the parties' contracts. We are not empowered, under the circumstances, to redraft the parties' contracts to add such a provision.

## IV. ALLEGED FUNDRAISING

Defendant also argues that the Yacoub and Kashat transactions, and the money that exchanged hands in the process, was "fundraising . . . with the *intent* to pay off [defendant]." It

contends that defendants' conduct therefore constituted refinancing with the intention of pre-paying some or all of plaintiffs' debt, in violation of paragraph 2c of the contract. We find defendant's reasoning difficult to follow, and insofar as we can discern an argument, we disagree.

It appears from an affidavit provided by defendant's principal, John Klyder, that Mahant had initially offered to purchase the hotel, but Klyder retained an emotional connection to the hotel and believed plaintiffs would treat the hotel with greater care. Furthermore, plaintiffs offered to purchase the hotel on a land contract worth more, over the long term, than Mahant's offer. Klyder expected the parties to have a long-term relationship, so the parties' contract was intended to preclude plaintiffs from "flipping" the property. Pursuant to that goal, *inter alia*, Klyder avers that "raising funds from other sources [than from operating the hotel] was an intentional action to avoid accountability to [defendant]." Klyder further contends that plaintiffs deceitfully found a way to avoid their contractual obligations and to craft a short sale to Mahant at great profit to themselves and at a great loss to defendant.

Because the proceedings are at a summary disposition stage, we presume the above to be true. See *Dextrom*, 287 Mich App at 415-416. Nevertheless, the parties' contracts contain an integration clause expressly stating that

> This Agreement and the Agreements to which it refers constitutes [sic] the entire Agreement between the parties and shall be deemed to supersede and cancel any other agreement between the parties relating to the transaction contemplated herein. None of the prior and contemporaneous negotiations, preliminary drafts, or prior versions of the Agreement leading up to it [sic] signing and not set forth in this Agreement shall be used by any of the parties to construe or affect the validity of this Agreement. Each party acknowledges that no representation, inducement, or condition not set forth in this Agreement has been made or relied upon by either party.

Consequently, because the contracts are also unambiguous on their face and there is no allegation that they contain any latent ambiguity, we are bound to enforce the contracts on the basis of what they actually say, rather than on the basis of what defendant may have expected. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51-52; 664 NW2d 776 (2003); *Burkhardt v Bailey*, 260 Mich App 636, 656-657; 680 NW2d 453 (2004); *Zwiker v Lake Superior State Univ*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 355128), slip op at p 12.

Nothing in the contract forbids fundraising in the abstract. Nothing in the contract defines "refinancing," so we give the word its common, everyday meaning. *Cavalier Mfg Co*, 222 Mich App at 94. According to Merriam-Webster's Collegiate Dictionary (11th ed), "refinance" means "to renew or reorganize the financing of" or "to finance something anew." Somewhat more helpfully, according to Black's Law Dictionary (11th ed), "refinancing" means "An exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan." The latter definition appears to be consistent

with how the word is commonly and currently used.[3]  Therefore, in the absence of an alternative definition provided by the contract itself, "refinancing the debt" would entail exchanging one loan for another, not just raising money.

In short, whatever plaintiffs' intentions might have been, merely raising money—whether by "fundraising" or some other means—does not constitute "refinancing" a debt.  Furthermore, if plaintiffs have found a loophole in the contract that permits them to violate defendant's expectations without violating any of the contract's plain terms, then the contract was simply not adequately drafted to address all eventualities.[4]  Even construed in the light most favorable to defendant, we are unable to conclude that plaintiffs' conduct violated paragraph 2c of the contracts.

## V.  PROCEDURAL ISSUES

Defendant argues that summary disposition should not have been granted prior to the conclusion of discovery.  Although typically "a decision to grant summary disposition is premature if discovery has not been completed," "summary disposition may still be appropriate before the conclusion of discovery if there is no fair likelihood that further discovery would yield support for the nonmoving party."  *Redmond v Heller*, 332 Mich App 415, 448; 957 NW2d 357 (2020).  As discussed, even presuming all of the facts (and even all of the speculation) advanced by defendant to be true, those facts would still not entitle defendant to a pre-payment penalty under paragraphs 2c, 2e, or 2g of the parties' contracts.  No further discovery could benefit defendant.

Finally, without any citation to authority, defendant argues that plaintiffs should have been found in default of the contracts because of the issues discussed above and also because plaintiffs made late payments before March 2020, and no payments after March 2020.[5]  Defendant never filed a counterclaim regarding this issue, so it was not properly before the trial court.  See *City of Bronson v American States Ins Co*, 215 Mich App 612, 618-619; 546 NW2d 702 (1996).  Although defendant did discuss the issue of late or absent payments in the trial court, the Land Contract provides that defendant's remedies in the event of a default are termination of the contract and retention of moneys paid so far, or acceleration of the balance due.  Those remedies are inconsistent with the consistent substance of defendant's arguments: that defendant was entitled to the pre-payment penalty.  Even on appeal, defendant asserted that the issue is only how much money it is owed.  We also note that counsel for plaintiffs advised the trial court that the outstanding payments due to defendants were being paid into an escrow account, to be paid as soon as the sale to Mahant

---

[3] See < https://www.investopedia.com/terms/r/refinance.asp >, < https://www.federalreserve.gov/pubs/refinancings/ >.

[4] For example, defendant could have insisted on imposing conditions upon any change in the makeup of plaintiffs' membership, requiring defendant's approval of any sale of the Property by plaintiffs, or simply forbidding pre-payment of the land contract altogether.

[5] Defendant may also advance an argument under a provision of the contracts regarding assignment of leases and rents, but we are unable to follow that argument, if it is indeed being made.

was completed.  Under the circumstances, we cannot find error in the trial court's decision not to hold plaintiffs in default of the contracts.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra