**AETNA CASUALTY AND SURETY CO., Plaintiffs,**

v.

**The DOW CHEMICAL CO., Defendants.**

No. 93–73601.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 2, 1998.

Order Clarifying Opinion on
Denial of Reconsideration,
Oct. 29, 1998.

Joseph A. Hinkhouse, Lord, Bissell & Brook, Chicago, IL, for London Insurer.

Michael Foradas, Kirkland & Ellis, Chicago, IL, for Dow Chemical.

## OPINION AND ORDER DENYING LONDON INSURERS' MOTION FOR SUMMARY JUDGMENT REGARDING THE "EXPECTED OR INTENDED" CLAUSE WITH RESPECT TO THE CONALCO SITE

EDMUNDS, District Judge.

This matter came before the court at a hearing on August 17, 1997, on London Insurers'[1] motion for summary judgment with respect to the Conalco site, incorporating by reference the motion for summary judgment regarding the absence of any "occurrence" at the Conalco site filed by Travelers.[2] For the reasons more particularly set forth below, there is a genuine issue of material fact whether Dow's officers or directors subjectively expected or intended that disposal of thorium waste at Conalco would contaminate the top soil or the subsoil. Thus, the London Insurers' motion for summary judgment regarding the "expected or intended" clause with respect to the Conalco site is DENIED.

## I. Facts

Dow owned and operated an aluminum processing and magnesium extrusion plant in Madison, Illinois from 1952 to 1969. In 1956, Dow began producing thorium alloys at the plant. A by-product of the product was radioactive thorium[3] sludge. The sludge was an insoluble gravel-like material which could not become airborne. Dow fenced off a forty acre parcel adjoining the plant for the disposal of the thorium. This parcel is known as the "Conalco site."

Dow obtained a license from the Atomic Energy Commission (AEC) for the storage of the waste at Conalco. The AEC was succeeded by the Energy Research and Development Authority which was then succeeded by the Nuclear Regulatory Commission. In 1987, the Illinois Department of Nuclear Safety assumed responsibility for materials

---

1. The London Insurers are more specifically identified in their motion for summary judgment at page 1, n. 1.

2. London's motion incorporates by reference Travelers' Motion for Summary Judgment Regarding the Absence of Any "Occurrence" at the Conalco Site. The motion was filed on May 15, 1998, by The Travelers Indemnity Company, The Travelers Insurance Company and The Travelers Casualty and Surety Company, formerly known as The Aetna Casualty & Surety Company (collectively "Travelers"). Travelers withdrew its motion on July 1, 1998. However, the Court must consider Travelers motion because it was incorporated by London in its motion and because on June 9, 1998, it was joined by the International Insurance Company (successor in interest to International Surplus Lines Insurance Company). Further, the following insurers joined in London's motion with respect to the Conalco site: Continental Casualty Company (5/26/98 joinder); Fireman's Fund Insurance Company, together with its subsidiaries Associated Indemnity Corporation and The American Insurance Company (5/27/98 joinder); and Peerless Insurance Company (6/23/98 joinder).

The Court also considered Dow's Combined Motion for Summary Judgment Regarding the Conduct-Based Exclusions, together with the many response, joinder, and reply briefs, as they relate to the legal issues addressed here.

3. Thorium is also naturally occurring. It is a metallic element that is radioactive, with a half-life of fourteen billion years.

located within Illinois. During the time Dow stored the thorium at Conalco, it operated the disposal site pursuant to its license and in compliance with the applicable governmental regulations. It fenced the site, posted signs reading "Caution Radioactive Materials," trained its employees, tested for air emissions, and monitored the site.

In 1969, Dow leased the Madison, Illinois plant to Phelps–Dodge Aluminum Company. Phelps Dodge and Aluswiss merged and their successor, Consolidated Aluminum Company (Conalco), assumed the lease of the plant. In 1973, Dow sold the plant to Conalco and transferred its thorium disposal license to Conalco. Conalco operated the plant until 1986 when it sold the plant to Spectrulite Consortium, Inc. Spectrulite purchased the plant, but did not purchase the 40 acre thorium disposal site. Conalco retained ownership of the disposal site.

Around the time Conalco sold the plant to Spectrulite, the thorium disposal site was closed.[4] Conalco contacted Dow, requesting that Dow share in the cost of removing the thorium because Dow was responsible for a great deal of the material. On March 8, 1988, Dow and Conalco entered into a Settlement Agreement whereby they agreed to split equally the remediation costs. The remediation program consisted of the removal of the thorium plus soil that was contaminated by the thorium. The thorium and the soil was disposed of in the Envirocare Landfill in Clive, Utah. The remediation was completed in 1992 at a cost to Dow of approximately $17.2 million.

Dow now seeks insurance coverage for the monies it spent removing the radioactive thorium from the Conalco site. The London Insurers seek a summary judgment finding that these costs are not covered by insurance policies it issued to Dow from 1955 to March 11, 1971.[5]

4. The Insurers allege that Conalco decided to close the site. Dow alleges that in 1986 the governing authority, the Illinois Department of Nuclear Safety, informed Conalco that it could not continue to store thorium at the site. Dow's Exhibit 5, Braun Dep. p. 27.

## II. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. Analysis

London has moved for summary judgment regarding the Conalco site on three grounds:

1. Coverage is precluded because the damage was "expected or intended" by Dow;

2. The "owned property" provisions of the London policies preclude coverage; and

3. Dow's cost for the thorium removal was a mere "business expense" not covered by insurance.

This opinion deals with the issue of the "expected or intended" clause only. The remaining issues are considered in the Court's

5. With respect to the London insurance policies from March 11, 1971 to December 1, 1985, the Court previously granted summary judgment in favor of the London Insurers.

Opinion and Order addressing Dow's Motion for Summary Judgment Based on the "Owned Property" and "Alienated Premises" exclusions.

### A. Damage "expected or intended" by the insured

■ The London insurers contend that insurance coverage at the Conalco site is barred by the following policy language:

> The term "Occurrence" wherever used herein shall mean an accident or a happening or an event or a continuous or repeated exposure to conditions *which unexpectedly and unintentionally results in personal injury, property damage* or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.[6]

London Insurers' motion for summary judgment with respect to Conalco, Exhibits 27 & 28. This language is clear and unambiguous and should be enforced as written. *Arco Indus. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 404, 531 N.W.2d 168, 173 (1995) (interpreting similar language).

### 1. Burden of Proof

The parties dispute who has the burden of proof to establish whether Dow "expected or intended" the damage at the Conalco site. The London Insurers contend that Dow has the burden of proof because the "occurrence" language is part of the insuring agreement of the policies and is not part of the exclusion clauses. Dow asserts that the "expected or intended" language operates as an exclusion clause and thus the insurers have the burden of proof on this issue.

■ It is settled law that the policyholder has the burden of proving facial coverage under an insurance policy, *Clark v. Hacker*, 345 Mich. 751, 756, 76 N.W.2d 806, 807 (1956), and the insurer has the burden of

proving that an express exception to coverage applies. *Roddis Lumber & Veneer Co. v. American Alliance Ins. Co.*, 330 Mich. 81, 88, 47 N.W.2d 23, 26 (1951). However, whether the "expected or intended" language in the occurrence definition of an insurance policy is insuring language or whether it is exclusion language is not a settled issue. Where the state's highest court has not spoken on an issue, a federal court must determine what that court would decide if faced with the same issue. *Grantham and Mann, Inc. v. American Safety Prod., Inc.*, 831 F.2d 596, 608 (6th Cir.1987).

The better reasoned cases allocate the burden of proof to the insured because the "expected or intended" language is in the part of the policy which is a grant of insurance coverage. In Justice Boyle's concurrence in *Arco*, 531 N.W.2d at 182, she explained that the insured should bear the burden of proof when the "expected or intended" language is in the definition of "occurrence," located in the coverage portion of the policy rather than in the policy's exclusions. *Accord Indiana Gas Co., Inc. v. Aetna Cas. & Sur. Co.*, 951 F.Supp. 790 (N.D.Ind.1996), *vacated on other grounds*, 141 F.3d 314 (7th Cir.1998), petition for *cert.* filed August 11, 1998; *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1295 (D.Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir.1995); *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 F.Supp. 1136, 1143–44 (D.N.J. 1993), *aff'd*, 89 F.3d 976 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). "The burden does not shift to the insurer to prove than an occurrence was intended or expected, though the insurer may interpose evidence of insured's knowledge to prevent the insured from meeting its burden." *Quaker State*, 868 F.Supp. at 1296.[7] In addition, the policyholder should bear the burden of proof because the policyholder is the party in possession of, and

---

6. London indicates that the definition of "occurrence" varies slightly in the policies.

7. Note that in her concurrence in *Arco*, Justice Boyle explains that the burden of proof does shift under the terms of insurance policies where the "expected or intended" language is in a separate exclusion clause. In those cases, the policyholder has the burden of proof to show that an "accident" occurred under the insuring clause. Then the burden of proof shifts to the insurer to prove that the damages were "expected or intended" under the exclusion clause. *Arco*, 448 Mich. at 425, 531 N.W.2d at 182.

has greater access to, evidence regarding its own expectations and intentions. *Queen City Farms v. Central National Ins. Co.,* 124 Wash.2d 536, 126 Wash.2d 50, 882 P.2d 703 (Wash.1994).

Dow argues that this Court should follow the contrary line of cases holding that the insurer bears the burden of proof to show that the insured "expected or intended" the property damage. Courts that allocate the burden to the insurer reason that the "expected or intended" language operates as an exclusion clause. *The Upjohn Co v. Aetna Cas. & Sur. Co.,* 1994 U.S.Dist. Lexis 11581 at *32 (W.D.Mich. July 22, 1994) (Dow's Exhibit 2); *Dow Chem. Co. v. Assoc. Indem. Corp.,* No. 85–CV–10037–BC (E.D.Mich. Mar. 20, 1991) (Dow's Ex. 3) (*Sarabond* litigation); *Smith v. Hughes Aircraft Co.,* 783 F.Supp. 1222, 1235–36 (D.Ariz.1991) (*aff'd in part, rev'd in part on other grounds,* 10 F.3d 1448 (9th Cir.1993), *op. amended and superseded by,* 22 F.3d 1432 (9th Cir.1993)); *Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.,* 750 F.Supp. 1340 (E.D.Mich.1990); *Clemco Indus. v. Commercial Union Ins. Co.,* 665 F.Supp. 816, 820–21 (N.D.Cal.1987), *aff'd,* 848 F.2d 1242, 1988 WL 57970 (9th Cir.1988) (Table). "[T]o place the burden on the insured would exalt form over substance and ignore the fundamental effect of the language. The purpose and function of the instant clause is to limit coverage...." *Dow Chem. Co. v. Assoc. Indem. Corp.,* No. 85–CV–10037–BC at *3. *See also Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,* 73 F.3d 1178, 1205 (2d Cir.1995) (insurer has burden of proof because "exclusivity effect of policy language, not its placement, controls allocation of burden of proof"), *op. modified on other grounds,* 85 F.3d 49 (2d Cir.1996).

It could also be argued that placing the burden on the insured is contrary to the interests of judicial economy and fairness because it would require the insured to prove a negative, i.e. that it had no expectation of harm at any time. One commentator opined, "The cost and difficulty of proving the non-existence of such an expectation would be both enormous and pointless, for in most cases resolution of the issue would still depend on the persuasiveness of any affirma-

tive proof adduced by the insurer that the insured expected or intended harm." Kenneth Abraham, *Environmental Liability Insurance Law,* p. 141 (1991) [hereinafter cited as Abraham]. *See Harrow Products, Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1020 (6th Cir.1995) ("[I]t would be strange to force a party to prove a negative, that the spills were not all sudden and accidental.")

■ This Court finds the rationale in support of placing the burden of proof on the insurer to be unpersuasive. The argument that the "expected or intended" clause should be treated as an exclusion because it operates like an exclusion clause is a weak one. "[V]irtually all of the language in [a policy] after the insurer's promise to 'pay all sums the insured shall become legally obligated to pay ...' qualifies or limits the scope of this promise in one way or another." *Queen City,* 882 P.2d at 715 (citing Abraham at 140–41).

> It is clear to this court that the "expected or intended" language is not an exclusionary clause even though, in a sense, it limits the coverage provided. Most of the language in an insurance policy limits coverage to some degree, as to define what is covered will necessarily exclude what is not covered.

*Indiana Gas,* 951 F.Supp. at 793.

In addition, the argument that placing the burden on the policyholder unfairly burdens the policyholder because it requires proof of a negative is not persuasive in an environmental case such as this one. In determining the intent or expectation of the insured, a court need not rely solely on the testimony of the insured that it did not intend or expect to cause damage. An insured can present evidence that he had no expectation or intent based on the knowledge possessed by the scientific community regarding the then known likelihood of damage to be caused by the release of various substances. *See Arco,* 448 Mich. at 429, 531 N.W.2d at 184 (Boyle, J., concurring).

It should also be noted that requiring the insured to prove that it did not expect or intend harm is consistent with precedent requiring the insured to prove the "sudden and accidental" exception to the pollution exclu-

sion. Courts have held that it is the policyholder's burden of proof to show that a release was "sudden and accidental." *Harrow Products, Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1020 (6th Cir.1995). The "sudden and accidental" issue and the "expected or intended" issue are the opposite sides of the same coin. The word "accident" has been defined as "a result which ... takes place without the insured's foresight or expectation and without design or intentional causation on his part." *Group Ins. Co. of Mich. v. Czopek*, 440 Mich. 590, 597, 489 N.W.2d 444 (1992). In other words, part of proving that a release was "accidental" is proving that the release was unexpected and unintended.

In conclusion, the Court holds that the policyholder, Dow, bears the burden of proof to demonstrate that it did not expect or intend the damage that occurred at Conalco. The London policies were drafted with the "expected or intended" language in the insuring clause, and Dow is in possession of and has greater access to evidence regarding its own expectations.

## 2. Intentional Acts Causing Unintended Harm

Noting that the fortuity requirement is one of the basic tenets of insurance law, the London Insurers argue that Dow has failed to bring forth any evidence of an "occurrence" at Conalco because Dow intentionally dumped and stored thorium waste at the site. The policy defines "occurrence" as "an accident or a happening or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury [or] property damage." The London Insurers argue, in essence, that there was no occurrence or accident because Dow acted intentionally.

█ The London Insurers ignore this Court's previous holding that under Michigan law an insured may obtain insurance coverage for intentional acts that cause unintended and unexpected harm. In other words, "it is the quality of result rather than the quality of the cause that is controlling." *Arco*, 448 Mich. at 425 n. 12, 531 N.W.2d at 182 n. 12 (Boyle, J., concurring) (citing 7A Appleman, *Insurance Law & Practice* (rev. ed.),

§ 4492.02, p. 31). In its April 10, 1998 opinion, this Court explained as follows:

When left undefined, the Michigan Supreme Court has interpreted "accident" as:

anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby— that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.

*Group Ins. Co. of Mich. v. Czopek*, 440 Mich. 590, 597, 489 N.W.2d 444 (1992). The Michigan Supreme Court also requires that, when the insurance contract is silent as to perspective, the term "accident" is to be evaluated from the standpoint of the insured; not the injured party. *Arco Ind. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 405, 531 N.W.2d 168 (1995).

In *Frankenmuth Mut. Ins. v. Piccard*, 440 Mich. 539, 548–49, 489 N.W.2d 422 (1992), the Michigan Supreme Court rejected the same argument Century raises here, i.e., that intentional acts cannot be considered "accidents" even though they cause unexpected and unintentional harm. The *Piccard* Court observed that "it is possible to have a cause of action where the intentional conduct will result in unintended and unexpected injury thus constituting an 'accident' under the policy language." *Id.*

█ The London insurance policies similarly do not define accident. Thus, the definition set forth above applies. Also, the London policies exclude coverage for accidents that are unexpected or unintended, and are silent regarding perspective. Therefore, the accident must be viewed from the standpoint of the insured, Dow.

The London Insurers argue that there is no insurance coverage for damage caused by intentional disposal of waste because such

damage does not satisfy the first prong of the definition of occurrence. They argue that Dow must show both 1) that there was an "accident" and 2) that the damage was "unexpected and unintended." In support of this proposition, the London Insurers rely on *Tecumseh Products Co. v. American Employers Ins. Co.*, 217 Wis.2d 289, 577 N.W.2d 386 (Table), 1998 WL 63179 (Wis.Ct.App. Feb.18, 1998), *review denied,* 217 Wis.2d 520, 580 N.W.2d 690 (Wis.1998) (Table).

From 1966–1972, Tecumseh Products dumped PCB laden materials in a pit near its aluminum diecasting plant on the banks of the Sheboygan River. Over time, due to erosion, high river flows, and periodic flooding, the PCB's polluted the river. The DNR demanded remediation, and the insured sought insurance coverage for its costs in dealing with the contamination. The insurance company argued that it was not required to provide coverage because the insured intentionally dumped the PCB's and thus the resulting damage to the environment was not accidental under the policy. The Wisconsin Court of Appeals interpreted *Arco* as requiring the insured to meet a two pronged test and held that the insured did not meet the first prong because it did not show that the release of contaminants was accidental.

> Tecumseh routinely placed PCB-contaminated fluids and material in an earthen pit behind the plant. The placement of contaminated material into the environment was not accidental; it was Tecumseh's usual manner of disposing of these materials.... Where the release of contaminants is not accidental, there can be no occurrence under AEIC's policy.... Because the first prong of the *Arco* analysis is not satisfied, we do not address the second prong: what Tecumseh subjectively expected or intended with regard to the release of the contaminant into the environment.

*Tecumseh,* 1998 WL 63179 *3.

The Tecumseh court misinterpreted the majority opinion in *Arco.* While the *Arco*

court does note that some of the contamination in that case came from accidental spills, the court then clarified that there can be an "occurrence" resulting from intentional acts when the intentional acts cause unintended harm. 448 Mich. at 416, 531 N.W.2d at 178 (citing *Piccard,* 440 Mich. at 548–49, 489 N.W.2d at 422). Further, where there was no intent or expectation to harm the environment, "the issue whether there were intentional releases of VOCs is irrelevant." 448 Mich. at 416, 531 N.W.2d at 178. As Justice Boyle clarified in her concurring opinion in *Arco,* "the only analysis necessary in this regard is whether the *damages* were intended or expected from the standpoint of the insured. That inquiry sufficiently encompasses the threshold determination of 'accident' as this Court had defined that term." 448 Mich. at 419, 531 N.W.2d at 179.

Moreover, the *Tecumseh* court misinterpreted the first prong of the test. Justice Boyle in her concurrence expressly defined the two pronged test as follows: "(1) whether there were unintended acts (wherein the results would clearly be unintended) or intentional acts with unintended or unexpected results, i.e., an accident, then (2) whether the damage resulting from the accident was subjectively intended or expected." 448 Mich. at 423, 531 N.W.2d at 181.[8] The *Tecumseh* court reasoned that because there were no unintended acts there was no accident. The court should have determined whether there were unintended acts *or* intentional acts, either of which resulted in unintentional harm.

The London Insurers also cite three other cases in support of their claim that intentional disposal of waste cannot constitute an "occurrence" under Michigan law: (1) *City of Bronson v. Am. States Ins. Co.,* 215 Mich. App. 612, 546 N.W.2d 702 (1996); (2) *Bogle v. Travelers Indem. Co.,* 1995 WL 854727, No. 154889 (Mich.Ct.App. Aug.15, 1995); and (3) *American States Ins. Co. v. Maryland Cas. Co.,* 587 F.Supp. 1549 (E.D.Mich.1984). These cases, in fact, do not support such a broad proposition.

---

8. Justice Boyle argues cogently that the two pronged test asks the same question twice and thus collapses into one prong, whether the in-sured subjectively expected or intended to cause harm. 448 Mich. at 423, 531 N.W.2d at 181.

First, in the *City of Bronson* case, there was evidence that the insured actually knew that its disposal of industrial wastes was contaminating the environment at the time the disposal was occurring. The City operated a wastewater treatment system including waste lagoons. As early as 1949, the county received a report that water from a well near the lagoons was green in color and was contaminated with cyanide, chromium, and nickel. In 1950, the water resources commission held a hearing and evidence was presented that the lagoons were contaminating the groundwater. Despite this knowledge, the City continued to operate the waste lagoons until 1969. Thus, the court did not find that insurance coverage was precluded due to the intentional nature of the waste disposal; instead the court found that coverage was precluded because the insured actually expected or intended the resulting harm.

Second, in *Bogle v. Travelers Indemnity Co.*, the court misapplied Michigan law. Although the *Bogle* court cited *Arco* and noted that the subjective standard of intent applied, it did not in fact apply the subjective standard. Instead, it relied on *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 443 N.W.2d 734 (1989), and applied an objective standard, finding that because the insured intentionally dumped wastes, the resulting harm was the natural, foreseeable result of the dumping and thus was not an occurrence or accident. *Allstate v. Freeman* applied an objective standard of intent because it interpreted different insurance policy language. The policy in *Allstate* provided, "we do not cover any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person...." The Michigan Supreme Court interpreted the language "may reasonably be expected" to permit the inference of an objective standard. *Arco*, 448 Mich. at 407, 531 N.W.2d at 174. The insurance policy at issue in *Bogle*, like the policy in *Arco* and the London policies at issue here, did not include the "may reasonably be expected" language. The court should have applied the subjective intent standard, and should not have applied the objective standard of intent by examining the "foreseeable result" of the waste disposal.

Finally, the *American States* case was decided in 1984, before the Michigan Supreme Court's ruling in *Arco* in 1995. Thus, this case lacks precedential value.

In sum, under *Arco*, Dow is entitled to insurance coverage if it carries its burden of proof to show unintended and unexpected harm, even if the acts that caused the harm were intentional. In order to defeat the London Insurers' motion for summary judgment, Dow must bring forth evidence that there is a genuine issue of material fact regarding whether Dow subjectively expected the environmental damage that occurred at Conalco.

### 3. Specific Intent—Type/Magnitude of harm

The Insurers claim that Dow expected damage to the top soil and, because Dow expected some harm to occur, Dow may not obtain coverage for any damage that occurred. Dow argues that it did not expect damage to the top soil. Dow further argues that even if it expected damage to the top soil, it did not expect the specific type or magnitude of damage that actually occurred, and thus the damage was a covered "occurrence" under the policies.

There is little authority regarding the issue of specific intent. One case, *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1376 (D.N.J.1992), found that the insured must have intended the specific type of environmental damage before coverage would be precluded by the "expected or intended" clause. The court held that evidence that the insured expected its waste disposal procedures to cause surface water contamination and air pollution did not show that the insured intended the groundwater contamination that occurred. Thus, the contamination was a covered "occurrence."

In contrast, in cases where an insured engages in inherently dangerous behavior with intent to cause some type of harm, courts find that the insured cannot obtain insurance coverage by claiming that he did not intend the specific injury that occurred. The insured need not intend the actual bodily injury inflicted in order to fall within the exclusionary clause; it is sufficient that the

insured subjectively expected some type of harm reasonably foreseeable from the insured's standpoint. *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 731 n. 11, 443 N.W.2d at 742 n. 11 (Archer, J., concurring in part, dissenting in part).[9] For example, a court can infer intent as a matter of law when an insured participated in the armed robbery of a business that resulted in the death of an employee. *Arco*, 448 Mich. at 425 n. 13, 531 N.W.2d at 182 n. 13 (Boyle, J., concurring) (citing *Continental Western Ins. Co. v. Toal*, 309 Minn. 169, 244 N.W.2d 121 (1976)). In such a case the insured's claim that he did not expect the exact harm "flies in the face of all reason, common sense and experience...." *Allstate*, 432 Mich. at 720, 443 N.W.2d at 763–64 (Boyle, J., concurring in part, dissenting in part).

One court has held that a middle ground approach worked best. In *Morton International, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied*, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994),[10] the New Jersey Supreme Court defined the issue as "whether any intent to injure will render the resulting injury intentional, whether the wrongdoer must intend the specific injury that results, or whether there is some middle ground between the two approaches." *Id.* at 85, 629 A.2d at 879. In deciding this issue, the court balanced the need to deny insurance coverage to wrongdoers with the need to compensate victims and provide insurance coverage consistent with the insured's reasonable expectation of coverage for unexpected harm. *Id.* at 82,

629 A.2d at 878. The court found that a middle ground struck the best balance, holding as follows:

> Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury was "accidental" and coverage will be provided.

*Id.* at 85, 629 A.2d at 879. The degree of culpability of insureds held responsible for environmental damage varies greatly and coverage litigation must be decided on a case by case basis. *Id.* at 86–87, 629 A.2d at 880.

Applying this standard to the facts before it, the *Morton* court found that the insured subjectively expected to cause environmental damage due to its disposal of effluent containing mercury into a ditch that flowed into a neighboring river. Because the extent of the environmental harm that occurred was not improbable, the court did not have to inquire whether the insured subjectively expected to cause the specific injury that occurred.[11] Correspondence between government officials and the mercury processing plant as well as reports from both government and company engineers indicated that the insured knew that its discharges were likely to cause environmental harm.

**9.** *See New Hampshire Ball Bearings v. Aetna Cas. & Sur. Co.*, 43 F.3d 749 (1st Cir.1995) (*dicta* notes that providing insurance coverage unless insured specifically intended precise harm would require courts to engage in prohibitive mircoanalytical approach; case decided on other grounds, under New Hampshire law, which applies objective standard and focus on accidental nature of the act, not the injury).

**10.** The *Morton* case applies New Jersey law. New Jersey law is substantially similar to Michigan law; it applies a subjective standard of intent and provides insurance coverage for unintentional damage that results from intentional acts. 134 N.J. at 82–84, 629 A.2d at 877–78.

**11.** The court stated, "we do not consider that differences in harm relating to the severity of environmental damage give rise to a finding of

'improbability' of harm that invokes the need for evidence of subjective intent." 134 N.J. at 90–91, 629 A.2d at 882. Due to such broad wording, commentators have expressed a concern that the court carved out an exception for environmental cases, where improbability of harm can never be found. M. Elizabeth Medaglia & Kent E. Lewis, "Expecting /Intending New Coverage Disputes: What Have We Learned From Environmental Coverage Litigation," 31 Tort & Ins. L.J. 797 (Sum.1996). The statement should be read more narrowly. The *Morton* court made the statement not as part of its statement of the law but instead as part of its application of the law to the facts at hand. The *Morton* court found that under the circumstances before it, the court did not find the severity of environmental damage that occurred to have been improbable.

The *Morton* analysis is persuasive and it does not contradict the analysis of the *Freeman* court. An insured who engages in inherently dangerous conduct with intent to cause some harm would not be entitled to insurance coverage because the extent of the injuries would be probable and thus subjectively intended under the *Morton* test. Accordingly, the trier of fact must examine whether, under the circumstances of this case, Dow subjectively intended or expected to cause some sort of injury. If so, that intent generally should preclude coverage. However, if there is evidence that the extent of the damage that occurred was improbable, then the trier of fact must inquire as to whether Dow subjectively intended or expected to cause the extensive damage that occurred.

### 4. Evidence of Corporate Expectation and Intent

#### a. Conduct

Evidence of subjective corporate intent can be shown by examining the nature of the insured's conduct as well as its subjective awareness. In *Arco*, the Michigan Supreme Court explained that courts should examine both 1) whether the insured's *conduct* evidenced an intent to damage the environment and 2) whether the insured had the *awareness* that damage was likely to follow from its conduct. 448 Mich. at 410, 531 N.W.2d at 175 (emphasis added). In her concurrence in *Arco*, Justice Boyle points out that in determining intent, courts need not rely solely on the testimony of the insured. Intent "can be inferred from the nature of the act in question and the high degree of probability, i.e., a substantial probability of resulting damage." *Arco*, 448 Mich. at 428, 531 N.W.2d at 183. While the court should examine the conduct of the insured, the court also must be careful not to subvert the subjective intent standard required by *Arco*. Evidence of conduct is only relevant as evidence of subjective intent.

It should also be noted that it is important to focus on whether the insured engaged in culpable conduct in order to enforce the important public policies at issue. Insureds who engaged in wrongful conduct, i.e. insureds who acted with the intent or expectation of causing harm, should not be afforded insurance coverage. Further, courts must avoid providing insurance coverage where to do so would create a "moral hazard" by encouraging policyholders to reduce efforts to mitigate harm.

The *Morton* court noted that, as a practical matter, the insured's conduct often influences a court's finding regarding intent. Where the insured took reasonable precautions to prevent damage and acted promptly to remedy damage after its discovery, courts are inclined to find that the damage was unintentional and caused by accident. Courts deny insurance coverage where the insured failed to avoid conduct which had a high risk of causing damage. 134 N.J. at 94, 629 A.2d at 884. While courts do not always acknowledge the public policy overlay to their holdings, their holdings imply that they considered the issue of culpability and attempted to effectuate a balance between the competing policy interests of denying insurance coverage to one who intentionally caused harm and providing coverage to victims harmed by policyholders who did not expect to cause harm.

In analyzing whether discharges were "sudden and accidental" in *South Macomb Disposal Authority v. American Ins. Co.*, 225 Mich.App. 635, 572 N.W.2d 686 (1997), the court drew a critical distinction between direct discharges into the environment without any expectation of containment and discharges into a licensed landfill where there is a reasonable expectation of containment. *Id.* at 671–72, 572 N.W.2d at 702–03. The court held that where the insured discharged wastes into a licensed landfill, the focus should be on the leakage of leachate and whether this was "sudden and accidental," not on whether the initial disposal of waste into the landfill was "sudden and accidental." The *South Macomb* court raised this distinction as part of its interpretation of the insurance policy language and not as a matter of public policy. Even so, the concept applies to a discussion of public policy and moral hazard. An insured who directly discharged wastes into a licensed landfill did not engage in culpable conduct because he had a reason-

able expectation of containment. To provide insurance coverage to an insured who acted responsibly would not reward highly risky conduct. Instead, it would encourage the insured to continue its efforts to prevent and minimize environmental contamination.

### b. Intent/Expectation of Managing Officers or Board of Directors

■ The Insurers argue that in determining Dow's intent, the court should apply an imputed collective knowledge standard. "The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority." *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (Mich.1991).

While knowledge may be imputed, subjective intent may not. Dow argues that the court should examine only the intent of its managing officers or the board of directors as expressly stated in Dow's primary insurance policies. The excess insurance provided by the London Insurers was at least as broad as the primary insurance provided by Travelers and Fireman's Fund for the purpose of the definition of "occurrence" and an analysis of the "expected/intended" clause.[12] Under the primary policy issued by Travelers, coverage was barred if the damage was "caused with intent to do harm by or at the direction of an executive officer or director of the insured." The Fireman's Fund primary policy provided that intent was measured from the standpoint of Dow's managing officers or board of directors. Dow's Combined Motion for Summary Judgment Regarding Conduct–Based Exclusions and Loss in Progress, Exhibit 17, 1974 letter agreement. The purpose of the intent provision is to ensure that the relevant expectation and intent is that of the corporate entity and not that of some individual employee.

Even if there was no express provision in the insurance policy that the relevant intent is that of the managing officers and directors of the corporation, courts must be careful in determining subjective corporate intent. The *Arco* court cautioned against making inferential leaps in determining subjective intent. In *Arco*, the plant chemist testified that he knew theoretically that VOCs should not be discharged into an unlined lagoon. However, he did not know that Arco was discharging VOCs into the lagoon and there was no evidence that the Arco employees who released the VOCs expected or intended to damage the environment.

> Although it is tempting to infer intention or an awareness of the dangers of VOCs, there simply was no testimony that any of Arco's employees released VOCs into the environment with the intention to harm the environment. Furthermore, there was no testimony that anyone should have expected that harm would result from their actions. We will not make such inferential leaps.

448 Mich. at 415, 531 N.W.2d at 177.

### c. Industry Knowledge

■ Very few courts have addressed the issue of the relevance of industry knowledge to an inquiry into an insured's subjective intent. In *The Upjohn Co. v. Aetna Cas. & Sur. Co.*, No. 4:88–CV–124 (W.D.Mich. July 22, 1994), 1994 U.S.Dist. Lexis 11581 (Dow's Exhibit 2), the court summarily held that evidence of knowledge in the industry was "simply irrelevant" to the determination of the subjective intent of the insured. Subsequently, the Michigan Supreme Court rule in *Arco*, and Justice Boyle in her concurrence pointedly noted that the knowledge of the general community of experts in environmental pollution during the relevant time peri-

12. Starting on December 20, 1962, the London policies contained an express "broad as primary" clause which provided that the excess insurance coverage was as broad as the coverage provided by the primary insurers. While the London policies from 2/14/55–11/19/56 and 5/31/59–12/20/62 did not contain a "broad as primary" clause, the London Insurers have acknowledged that these policies defined "occurrence" similarly to the primary policies for this period. The policies provided that damage caused intentionally by the officers or directors of the insured was not covered. London's Exhibit 27.

od [13] can constitute some evidence of an insured's expectation or intent. *Arco*, 448 Mich. at 429, 531 N.W.2d at 184 (J. Boyle, concurring). *See also Smith v. Hughes Aircraft Co.*, 22 F.3d 1432 (9th Cir.1993) (insured raised issue of fact regarding expectation by showing that until recently exposure to TCE was not considered harmful and insured never received any government notice objecting to its disposal practices). This Court adopts the view that industry knowledge can constitute evidence of subjective intent provided that there is a showing that the insured actually received and understood the information. *See* 28 Gonz.L.Rev. at 567 (where "industry knowledge" witness does not offer any evidence of actual knowledge of insured, this evidence invades the jury's function to weigh evidence and determine credibility).

### 5. Issues of Fact

The parties dispute whether Dow expected or intended the environmental harm that was caused by the disposal of the radioactive thorium at Conalco.[14] The Insurers claim that Dow knew of the dangers of radioactivity based on articles in the media, the government regulations regarding the operation and monitoring of the site, and the fact that Dow regulated its employees' access to the dump site. The Insurers further argue that Dow actually knew when it first began to dispose of the thorium that it would contaminate the top soil. Lawrence Silverstein, a Radiation Safety Officer employed by Dow from 1955–1960, testified in his deposition that as early as 1956 he would have known that thorium dumped directly onto the soil would contaminate the top soil. Traveler's Exhibit 11, Silverstein Dep. 187–88.[15]

However, Silverstein's deposition testimony is equivocal on this point. Dow points to the knowledge of the scientific community at the time of the thorium disposal and argues that because the thorium waste had the same low level of radioactivity as naturally-occurring thorium, Dow did not expect disposal directly on the ground to cause any environmental damage. Silverstein testified, "It is

---

**13.** It cannot be disputed that when determining intent/expectation from the standpoint of the insured such intent/expectation must be shown at the time of the culpable conduct, i.e. at the time the insured performed the acts which caused the environmental contamination.

Travelers argues that expectation and intent must be measured in reference to "property damage" under the policies and thus that Dow defines "property damage" differently for the purpose of triggering coverage than for the purpose of the expected/intended clause. "Dow cannot trigger a policy by alleging that (as at Conalco) the mere presence of a substance on the ground is 'property damage,' and then assert that no property damage was expected because the mere presence of a substance on the ground is, suddenly, *not* injurious." Travelers' Response to Dow's Combined Motion for Summary Judgment Regarding the Conduct Based Exclusions and Loss in Progress, pp. 9–10. To the contrary, Dow's position is logical and consistent with legal principles governing trigger and the intent clause. The law determines expectation/intent from the standpoint of the insured at the time the insured engaged in the conduct that caused the harm. While an insured who discharged wastes may not have expected or intended to cause damage to the environment, it may be discovered years later that the discharge in fact contaminated the soil or groundwater. Under the injury-in-fact theory of trigger of coverage adopted by the Michigan Supreme Court, coverage is triggered when the property damage first in fact occurred

and under subsequent policy periods when the damage continued to occur. *Gelman Sciences, Inc. v. Fidelity & Cas. Co.*, 456 Mich. 305, 572 N.W.2d 617 (1998).

**14.** The parties also dispute how much soil had to be remediated at the site. The Insurers contend that in addition to removing the thorium sludge, bulldozers scraped off two to twelve inches of contaminated top soil. London's Exhibit 17, 12/90 Report by Roy Weston. The Insurers contend that the soil had to be excavated more deeply only in the few places where Dow buried the thorium underground or where animals dug into the ground. Traveler's Exhibit 28, Braun Dep. pp. 87–91. In contrast, Dow argues that it had to excavate up to 25 feet deep in places. The issue of how much soil had to be removed is not relevant to 1) whether Dow expected the thorium to contaminate the top soil at all or 2) whether Dow expected the thorium to contaminate the top soil and expected the thorium to migrate deeper into the ground.

**15.** The London Insurers also claim that Dow expected to eventually remove the thorium from the Conalco site because it was licensed as a temporary disposal site which could remain open only so long as Dow or its successors stayed at the site. The fact that Dow may have expected to remove the thorium is irrelevant to the issue of whether Dow expected or intended that its disposal of thorium would damage the top soil or the subsoil.

hard to see how thorium could hurt the environment when it is already ubiquitous." Dow's Exhibit 52 to its Combined Motion for Summary Judgment Regarding the Conduct–Based Exclusions and Loss in Progress, Silverstein Dep. p. 184.

Even if Silverstein had knowledge regarding the possibility that thorium would contaminate the soil, this alone does not determine the issue of Dow's subjective intent. The London Insurers have not presented evidence that officers or directors of Dow had the knowledge and expected or intended to damage the soil when they decided to dispose of the thorium on the ground at the Conalco site. The Court will not make such inferential leaps. *Arco,* 448 Mich. at 415, 531 N.W.2d at 177.

In addition, there is evidence that Dow took reasonable precautions to prevent environmental damage. Dow monitored and maintained the thorium disposal site in full compliance with its license and the applicable regulations. Dow had to renew its license every five years, and the governing authority repeatedly reissued the license. Dow's disposal of thorium into a licensed area is some evidence that Dow subjectively expected that the thorium would not harm the environment.

While there is a genuine issue of material fact whether Dow expected or intended that its disposal of thorium at Conalco would contaminate the top soil, there is also an issue of fact whether Dow expected the extent of the environmental contamination that in fact occurred. While the thorium never contaminated the groundwater on the site, Dow contends that it had to remediate up to twenty-five feet of soil in places. If the trier of fact finds that Dow did not expect the top soil to become contaminated, logically it must find that Dow did not expect the thorium to contaminate the subsoil.

In the event that the trier of fact finds that Dow expected its thorium disposal to contaminate the top soil, the trier of fact must then determine if the extent of the damage at Conalco was improbable. If the extent of damage was probable, then Dow expected the damage and insurance coverage is excluded. If the extent of damage was improbable, then it must be determined whether Dow subjectively expected to cause that extensive damage. *Morton,* 134 N.J. at 85, 629 A.2d at 879.

Dow argues that when it disposed of the thorium it did not expect the thorium to migrate. Silverstein testified that the thorium pile was benign. "The nature of the pile was such that we did not anticipate any airborne material unless people came in and stirred it up with shovels or front loaders or something along that line. Unless acted upon, the pile was benign." Silverstein Dep. p. 131. The London Insurers' allegation that the thorium was insoluble bolsters Dow's claim that it did not expect the thorium to contaminate the soil. "The insoluble materials in the slag prevented it from moving into the soil or percolating into the ground." London's Summary Judgment Brief, p. 5. "[T]he thorium slag was insoluble, and did not move into the groundwater." London's Reply, p. 1.[16]

## B. Remediation of PCB contamination

Dow also expended $218,133.90 for the removal of PCB contaminated soil at the Conalco site. Dow alleges that it remediated the PCB contamination to prevent its migration to the groundwater. The London Insurers argue for the first time in their reply brief that they are entitled to summary judgment declaring that coverage is not provided for the PCB removal because "Dow presents no evidence that the PCB contamination took place during the period of London coverage." Reply p. 4 n. 3. This argument is raised in a footnote without any legal authority. While Dow bears the burden of proving coverage, the London Insurers, as the moving party in a summary judgment motion, bear the initial burden of showing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Because the London Insurers have not briefed this issue, and thus

---

16. There is some evidence that the thorium did migrate. *See, e.g.,* Dow's Exhibit 17, Schretter Dep. pp. 82 & 85.

have not set forth the law and the facts relevant to the issue, their request for summary judgment is denied.

## C. Assault and Battery Exception

 Dow argues that from November 1956 through July 30, 1970, its primary policies provided coverage for all sums which Dow was obligated to pay as damages as a result of property damage, bodily injury, or personal injury, excluding coverage only if the damage was caused by assault and battery committed by or at the direction of an executive officer of the insured. Dow claims that these policies did not have an exclusion for damages expected or intended by the insured. Because the excess insurance issued by the London Insurers from December 20, 1962 forward is as broad as the primary insurance, Dow claims that it is entitled to coverage by the London Insurers from this date forward, unless the Insurers come forward with evidence the damage was caused by an assault and battery.[17]

This argument is nonsensical since it "puts the cart before the horse." Dow has the initial burden of proving that it is entitled to insurance coverage before the insurers are required to show that an exclusion applies. In order to prove coverage under all of its liability policies, Dow must show that an occurrence or accident occurred. The Fireman's Fund 1956–1970 policies provide that the policy applies to accidents and occurrences that take place during the policy period. "Occurrence" is defined as "a single occurrence or a single accident, or a series of them arising out of one event or disaster." Fireman's Response to Dow's Motion for Summary Judgment re Conduct–Based Exclusions, Exhibit 1. The Travelers 1950–56 policies define "occurrence" as "an accident or a single or continuous or repeated exposure to conditions . . . ." and provide that the policy does not apply to injuries caused with intent to do harm. Dow's Motion for Summary Judgment re Conduct–Based Exclusions, Exhibit 16.

It is a basic principle that liability insurance covers only unanticipated future contingencies and does not cover expected or intended harm. This concept is incorporated in policy language covering "occurrences" and "accidents" and damage not "expected or intended" by the insured. Where a policy does not define the term "accident" the Michigan Supreme Court defined the term as:

anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and *unexpected* by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and *without design or intentional causation* on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.

*Group Ins. Co. of Mich. v. Czopek*, 440 Mich. 590, 597, 489 N.W.2d 444 (1992). Michigan courts generally have interpreted occurrence based policies as consistent with accident policies. *Frankenmuth Mut. Ins. Co. v. Masters*, 225 Mich.App. 51, 56–57, 570 N.W.2d 134, 136–37 (1997). *Travelers Ins. Companies v. P.C. Quote, Inc.*, 211 Ill.App.3d 719, 156 Ill.Dec. 138, 570 N.E.2d 614, 619 (1991) ("occurrence" requires damages to be neither expected nor intended).

In short, insurance coverage for accidents and occurrences requires damages that were unexpected and unintended from the standpoint of the insured. As discussed above, Dow has the burden of proof to show that an occurrence or accident occurred, i.e. that the damages were unexpected and unintended. Upon proving that it is entitled to coverage, the burden of proving an applicable exclusion falls on the Insurers. Dow is not somehow automatically entitled to coverage unless the Insurers prove that an exclusion applies.

## IV. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons stated above, the Court hereby orders as follows:

---

**17.** Starting on December 20, 1962, the London policies contained an express "broad as primary" clause. Prior to this, the London policies did not contain a "broad as primary" clause. The London policies from 1955 to 1962 expressly

stated that damage caused intentionally by officers or directors was not covered. Thus, Dow's assault and battery argument applies only to the London policies from 1962 to 1971.

The London Insurers' motion for summary judgment regarding the "expected or intended" clause with respect to the Conalco site is DENIED. The following insurers joined in the motion and thus their motions for summary judgment regarding the Conalco site are also DENIED:

The International Insurance Company (successor in interest to International Surplus Lines Insurance Company) (June 9, 1998 joinder);

Continental Casualty Company (5/26/98 joinder);

Fireman's Fund Insurance Company, together with its subsidiaries Associated Indemnity Corporation and The American Insurance Company (5/27/98 joinder); and

Peerless Insurance Company (6/23/98 joinder).

## OPINION AND ORDER DENYING LONDON INSURERS' MOTION FOR RECONSIDERATION AND CLARIFYING SEPTEMBER 2, 1998 OPINION AND ORDER DENYING LONDON INSURERS' MOTION FOR SUMMARY JUDGMENT REGARDING THE "EXPECTED OR INTENDED" CLAUSE WITH RESPECT TO THE CONALCO SITE

This matter came before the Court on London Insurers' motion for reconsideration and modification of the Court's September 2, 1998 order denying London Insurers' motion for summary judgment regarding the "expected or intended" with respect to the Conalco site. In the September 2, 1998 opinion, the Court denied the London Insurers' motion and held that there is a genuine issue of material fact whether Dow's officers or directors subjectively expected or intended that disposal of thorium waste at Conalco would contaminate the top soil or the subsoil. The London Insurers contend that with regard to certain London policies, the Court erred by focusing on the expectations and intentions of the officers and directors of Dow because these policies defined occurrence as an event which unexpectedly and unintentionally results in harm, without stating that the relevant intent is that of the insured's officers and directors. As explained below, the Court finds that even for those policies that do not expressly include the "officers or directors" language it is the intent of the responsible officials in management positions that is crucial. As explained below, the Court clarifies the September 2, 1998 Opinion. However, because the clarification does not call for a different disposition of the motion, the motion for reconsideration is DENIED.

## I. Facts

In the September 2, 1998 opinion (hereinafter cited as "Opinion"), the Court held that in order to defeat the London Insurers' motion for summary judgment, Dow must bring forth evidence that there is a genuine issue of material fact regarding whether Dow subjectively expected the environmental damage that occurred at Conalco. In defining subjective corporate intent, the Court explained as follows:

*b. Intent/Expectation of Managing Officers or Board of Directors*

The Insurers argue that in determining Dow's intent, the court should apply an imputed collective knowledge standard. "The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority." *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (Mich.1991).

While knowledge may be imputed, subjective intent may not. Dow argues that the court should examine only the intent of its managing officers or the board of directors as expressly stated in Dow's primary insurance policies. The excess insurance provided by the London Insurers was at least as broad as the primary insurance provided by Travelers and Fireman's Fund for the purpose of the definition of "occurrence" and an analysis of the "expected/intended" clause. Under the primary policy issued by Travelers, coverage was barred if the damage was "caused with intent to do harm by or at the direction of an execu-

tive officer or director of the insured." The Fireman's Fund primary policy provided that intent was measured from the standpoint of Dow's managing officers or board of directors. Dow's Combined Motion for Summary Judgment Regarding Conduct–Based Exclusions and Loss in Progress, Exhibit 17, 1974 letter agreement. The purpose of the intent provision is to ensure that the relevant expectation and intent is that of the corporate entity and not that of some individual employee.

Even if there was no express provision in the insurance policy that the relevant intent is that of the managing officers and directors of the corporation, courts must be careful in determining subjective corporate intent. The *Arco* court cautioned against making inferential leaps in determining subjective intent. In *Arco*, the plant chemist testified that he knew theoretically that VOCs should not be discharged into an unlined lagoon. However, he did not know that Arco was discharging VOCs into the lagoon and there was no evidence that the Arco employees who released the VOCs expected or intended to damage the environment.

Although it is tempting to infer intention or an awareness of the dangers of VOCs, there simply was no testimony that any of Arco's employees released VOCs into the environment with the intention to harm the environment. Furthermore, there was no testimony that anyone should have expected that harm would result from their actions. We will not make such inferential leaps.

448 Mich. at 415, 531 N.W.2d at 177.

Opinion at 432 (footnote omitted).[1]

In sum, the holding assumed that the focus should be on the intent of Dow's officers and directors based on the express words of the relevant primary and excess policies. The parties briefs did not focus on the fact that certain of the London policies did not include the officer or director language. Instead, the parties' briefs focused on Dow's argument that under the London policies from November 1956 through July 1970, coverage was excluded only if the damage was caused by assault and battery committed by or at the direction of an executive officer of the insured. The Court rejected this argument. See Opinion at 434–35.

Now, the London Insurers move for reconsideration, arguing that insurance coverage at the Conalco site is barred by the following policy language:

> The term "Occurrence" wherever used herein shall mean an accident or a happening or an event or a continuous or repeated exposure to conditions *which unexpectedly and unintentionally results in personal injury, property damage* or advertising liability during the policy period.

London Insurers' motion for summary judgment with respect to Conalco, Exhibits 27 & 28.[2] The London policies in effect before November 1956 and after March 1971 expressly stated that they did not apply to bodily injury or property damage caused with the intent to do harm "by or at the direction of an executive officer or director" of the insured. Thus, the September 2, 1998

---

1. The Court also found that it should examine both conduct and awareness to find subjective intent:

 *a. Conduct*
 Evidence of subjective corporate intent can be shown by examining the nature of the insured's conduct as well as its subjective awareness. In *Arco*, the Michigan Supreme Court explained that courts should examine both 1) whether the insured's *conduct* evidenced an intent to damage the environment and 2) whether the insured had the *awareness* that damage was likely to follow from its conduct. 448 Mich. at 410, 531 N.W.2d at 175 (emphasis added). In her concurrence in *Arco*, Justice Boyle points out that in determining intent, courts need not rely solely on the testimony of the insured. Intent "can be inferred from the nature of the act in question and the high degree of probability, i.e., a substantial probability of resulting damage." *Arco*, 448 Mich. at 428, 531 N.W.2d at 183. While the court should examine the conduct of the insured, the court also must be careful not to subvert the subjective intent standard required by *Arco*. Evidence of conduct is only relevant as evidence of subjective intent. Opinion at 431. Further, the Court held that "industry knowledge can constitute evidence of subjective intent provided that there is a showing that the insured actually received and understood the information." Opinion at 433.

2. The definition of "occurrence" varies slightly in the policies.

Opinion is correct that under these policies the Court must examine the expectation and intent of Dow's executive officers and directors. The London policies in effect between November 19, 1956 to March 11, 1971 did not contain the officer or director language. These are the policies at issue here. The question raised is exactly whose intent should a court examine in determining the intent of a corporate insured?

## II. Standard of Review

Pursuant to Rule 7.1(g) of the Local Rules for the Eastern District of Michigan, a motion for reconsideration should be granted if the movant demonstrates that the court and the parties have been misled by a palpable defect and that a different disposition of the case must result from a correction of such palpable defect. A motion that merely presents the same issues already ruled upon by the court shall not be granted. In this case, a clarification of the Court's September 2, 1998 Opinion does not change the result. Thus, the London Insurers' motion for reconsideration is DENIED.

## III. Analysis

### A. London Policies in Effect From November 19, 1956 to July 1970—Intent Measured From Standpoint of Officials in Management Positions

When the insurance contract is silent as to perspective, the term "accident" is to be evaluated from the standpoint of the insured; not the injured party. *Arco Industries Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 405, 531 N.W.2d 168 (1995). Logically, this applies equally to the definition of the term "occurrence." The London Insurers contend that when the policy is silent as to perspective, courts should apply the imputed collective knowledge standard under *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (Mich. 1991). As noted above, the September 2 Opinion rejected this argument. The Court held that while knowledge may be imputed for certain purposes, intent may not be im-

puted in the context of an "expected or intended" clause in a liability policy. The purpose of the intent provision is to ensure that the relevant expectation and intent is that of the corporate entity and not that of some individual employee. Intent should be measured at a level where it appropriate to attribute individual intention to the corporation.

One court has addressed this precise issue. In *Hoechst Celanese Corp. v. National Union Fire Ins. Co.*, 1994 WL 721786 (Del.Super. Apr.22, 1994) (Dow's Exhibit 7), a corporate insured sought liability insurance coverage under a policy which defined occurrence as damage neither expected or intended by the insured. The policy was silent as to exactly which corporate personnel's intent should be measured. However, a letter from the insurer indicated that the definition of occurrence would not be utilized to deny coverage unless the expectation or intent was that of a responsible official in a management position. Thus, the intent and expectation must be that of an official in a management position. The court explained that this was in accordance with public policy, and that while knowledge of lower level employees may be imputed to a corporation, intent should not be imputed.

> The Court finds that it would not be appropriate for defendant insurers to show "intent or expectation" of a "low-level" employee to be the "intent or expectation" of the corporation. The Court thus holds that it must be the "intent or expectation" of an official of the insured in a management position. This is in accord with New York law [3] that the knowledge of the lower employees may be imputed to the corporation. However, their intent or expectations are not imputed to the corporation. The question of who constitutes an appropriate "official in a management position" is an issue of fact for trial.

*Hoechst*, 1994 WL 721786 at *4.

Similarly, in *Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293, 1317 (5th Cir.1982), the court noted in *dicta* that the

---

**3.** *Hoechst* interpreted New York law, which is substantially similar to Michigan law. New York law applies a subjective standard of intent, and it

imputes knowledge of lower level employees to the corporation. 1994 WL 721786 at *3.

corporate insureds expected or intended harm where their "highest officers and important personnel" were aware of the disposal of hazardous wastes. "This case does not involve the unauthorized intentional act of an individual employee.... This was not a reflexive reaction by one of [the corporate insured's] many limbs, but rather the deliberate execution of a preconcerted plan, conceived in the mind of [the corporation] and carried out by a central system of key [corporate] personnel." *Id. See Premium Finance Co., Inc. v. Employers Reinsurance Corp.,* 979 F.2d 1091 (5th Cir.1992) (fraud by corporation's chief operating officer was attributable to corporation for purpose of insurance provision excluding coverage for fraudulent acts of corporate insured because CEO was solely vested with all decision making power).

This interpretation is consistent with the Michigan Supreme Court holding in *Arco Indus. Corp. v. American Motorists Ins. Co.,* 448 Mich. 395, 531 N.W.2d 168 (1995). In *Arco,* the plant chemist testified that he knew theoretically that VOCs should not be discharged into an unlined lagoon. However, he did not know that Arco was discharging VOCs into the lagoon and there was no evidence that the Arco employees who released the VOCs expected or intended to damage the environment.

> *Although it is tempting to infer intention or an awareness of the dangers of VOCs, there simply was no testimony that any of Arco's employees released VOCs into the environment with the intention to harm the environment. Furthermore, there was no testimony that anyone should have expected that harm would result from their actions. We will not make such inferential leaps.*

448 Mich. at 415, 531 N.W.2d at 177 (emphasis added).

Accordingly, the London policies in effect between November 19, 1956 to July 1970 which did not contain the officer or director language in the definition of occurrence must be interpreted as defining occurrence as an accident, happening, or event which unexpectedly and unintentionally, from the standpoint of Dow's officials in management position, results in personal injury or property damage.

■■■ The London policies in effect after July 1970 focus on intent by officers and directors. Fireman's Fund's primary policy which became effective in 1970 was amended by a 1974 letter agreement which provided that the reference to " 'damage not intended from the standpoint of the insured' in the definition of occurrence shall be construed to mean, in respect of the named insured, not intended from the standpoint of the named insured's managing officers or Board of Directors." Dow's Combined Motion for Summary Judgment Regarding Conduct–Based Exclusions and Loss in Progress, Exhibit 17, 1974 letter agreement. The London policies were in effect amended as well, because beginning in December 1962, the London policies expressly specified that coverage was at least as broad as that provided by the primary policy. The London policies contained a "broad as primary clause" which provided that the London policies shall be amended to follow the terms and conditions of the applicable underlying insurance.[4] Dow argues that the 1974 letter agreement applied to all of London's policies, including London's pre 1970 policies, because nothing in the letter indicates that it applies only to the policy then in effect. Thus, Dow argues that intent should be examined from the standpoint of the officers and directors of Dow under all of the London policies.

This argument fails. While the 1974 letter agreement does not expressly state that it applies only to the 1970 Fireman's Fund policy then in effect, it also does not expressly state that it applies retroactively. It is

---

4. The broad as primary clause provided:
 It is understood and agreed that in the event of loss for which [Dow] has coverage under the underlying insurance set out in the attached Schedule the excess of which would be recoverable hereunder except for terms and conditions of this policy which are not consistent with the underlying then notwithstanding anything contained herein to the contrary, *this policy shall be amended to follow the terms and conditions of the applicable underlying insurance in respect of such insurance.*
 Dow's Exhibit 6 at Addendum 5.

logical that the parties were amending the policy then in effect. If the parties intended to retroactively amend certain policies, they would have explicitly stated so.

Dow also argues that intent must be measured from the standpoint of the officers or directors of Dow because on April 29, 1975, the London Insurers wrote, in a letter reserving the right to deny coverage for punitive damages, that coverage would apply to acts committed or ratified with the knowledge of the managing officers or board of directors of Dow. This 1975 letter was written in reference to a 1973 accident. It did not purport to amend the terms of the London policies in effect from 1956 to 1970.

### B. London Policies in Effect After July 1970—Intent Measured From Standpoint of Officers and Directors

The London Insurers also argue that certain London policies should not be deemed to include the officer and director language under the broad as primary clause. The London Insurers argue, without authority, that the 1974 letter agreement was not a term or condition of the primary policy because it was a side agreement. This argument is meritless—the terms and conditions of the Fireman's Fund primary policy that went into effect after July 1970 were amended by the 1974 letter and the London policies which contained a broad as primary clause thus were also amended. Thus, the London policies in effect after July 1970 must be deemed to include the officer and director language.

## IV. Conclusion

For reasons stated above, even for those policies that do not expressly include the "officers or directors" language, it is the expectation and intention of the responsible officials in management positions that is crucial. As explained below, the Court clarifies the September 2, 1998 Opinion. However, because the clarification does not call for a different disposition of the motion, the motion for reconsideration is DENIED.